## COMMONWEALTH *vs.* ALFREDO COMPANONIO.

Plymouth. October 7, 2004. - August 30, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Competency to stand trial, Argument by prosecutor, Instructions to jury, Capital case. *Homicide. Due Process of Law,* Competency to stand trial. *Mental Impairment.*

The record of a murder trial did not not show a substantial question of possible doubt regarding the defendant's competency to stand trial. [46-51]
A criminal defendant convicted of murder failed to demonstrate in his motion for a new trial that his trial counsel rendered ineffective assistance by not presenting evidence that mental impairment deprived the defendant of the ability to form the specific intent to kill and to deliberately premeditate, where the record demonstrated that trial counsel did, in fact, have the defendant evaluated by a psychiatrist prior to trial; where the defendant failed to present any expert opinion testimony that, on the date of the murder, the defendant in fact had such a mental impairment; and where trial counsel's decision to forgo pursuit of such a defense was not unreasonable in light of the fact that it was based on the defendant's personal choice against the advice of counsel. [51-52]
The defendant at a murder trial failed to demonstrate reversible error in his trial counsel's failure to request individual juror voir dire, in certain remarks by the prosecutor during closing argument, or in certain of the judge's instructions to the jury. [52-54]

INDICTMENT found and returned in the Superior Court Department on June 10, 1986.

Following review by this court, 420 Mass. 1003 (1995), evidentiary hearings were had before *Suzanne V. DelVecchio,* C.J.; an appeal from orders issued by her was consolidated with appeals from the defendant's conviction and from the denial of a motion for a new trial.

*Chauncey B. Wood* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. This appeal is decided some eighteen years after

the defendant's conviction of murder in the first degree. The lengthy procedural history of the appeal that explains the delay is as follows. On April 23, 1987, a Superior Court jury convicted the defendant of murder in the first degree.[1] Almost five years later, on January 31, 1992, the defendant, represented by new counsel, filed a motion for a new trial in this court that was remanded to the Superior Court for disposition. On June 29, 1993, without conducting an evidentiary hearing, the trial judge allowed the defendant's motion on the basis that his trial counsel had furnished constitutionally ineffective assistance because counsel had failed to investigate fully the possibility that the defendant was suffering a mental impairment at the time of the killing. The Commonwealth appealed and, on June 1, 1995, this court vacated the judge's order granting a new trial, concluding that the record was insufficient to support the order, and directing the judge to:

> "(1) conduct a full evidentiary hearing on the motion for a new trial; (2) receive testimony from the defendant's trial counsel regarding the nature and extent of the defendant's instructions to him concerning trial strategy; and finally, (3) . . . enter a new order on the motion and, if the motion is granted, indicate whether, and in what respects, she relied on any special knowledge that she had garnered during the course of the trial about the effectiveness of defense counsel."

*Commonwealth* v. *Companonio*, 420 Mass. 1003, 1003 (1995). The trial judge complied with these directives, and on September 18, 2000, entered a memorandum and order denying the defendant's motion for a new trial.

The defendant appealed, and the defendant's then appellate counsel filed his appellate brief (to which the Commonwealth responded with its appellate brief). On December 31, 2001, the defendant filed a pro se motion asking that new counsel be appointed for him and that a new evidentiary hearing be held on his motion for a new trial. It was determined that new counsel should be appointed for the defendant. On July 25, 2002, the

---

[1]The jury returned a general verdict of murder in the first degree, but they were only instructed on deliberate premeditation.

defendant's present appellate counsel entered his appearance in this court. In the fall of 2002, present appellate counsel filed a motion and, soon thereafter, an amended motion for postconviction relief, which were remanded to the Superior Court. In the order of remand, this court directed that any resulting appeal "be consolidated with the appeal of the [defendant's] conviction." On May 28, 2003, the defendant moved for an evidentiary hearing on his amended motion for postconviction relief. In a written memorandum of decision and order dated September 22, 2003, a Superior Court judge (not the trial judge) denied the requested evidentiary hearing and the amended motion,[2] and, thereafter denied a motion to reconsider her order denying an evidentiary hearing. The defendant's present appellate counsel then perfected an appeal from these orders, which was consolidated with the appeal from the defendant's conviction and the appeal from the denial of his motion for a new trial.

The briefs filed by the defendant's former and present appellate counsel raise a variety of claims. The principal claims assert that the defendant's trial counsel provided the defendant with constitutionally ineffective assistance by not challenging the defendant's competency to stand trial and by failing to investigate fully whether (and argue to the jury that) the defendant lacked the capacity to form a specific intent to kill or to deliberately premeditate. These arguments, as well as the defendant's other arguments (which need not be referred to here) will be evaluated as instructed in *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992), under G. L. c. 278, § 33E, with consideration given to "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." We discern no basis to order a new trial under this standard. Further, after general consider-

---

[2]While the defendant's present appellate counsel labeled the motion an "amended motion for postconviction relief," undoubtedly concerned about the waiver of issues not presented in the first motion for a new trial, see Mass. R. Crim. P. 30 (c) (2), as appearing in 435 Mass. 1501 (2001), he admitted at the hearing on the motion that the filing was "actually an amended motion for a new trial." The judge deciding this motion correctly looked beyond the motion's label and defense counsel's semantics.

ation under G. L. c. 278, § 33E, of the record and the fairness of the verdict apart from the claims specifically argued, we find no basis to reduce the verdict or to order a new trial. We affirm the orders denying the defendant's motion for a new trial and the amended motion for postconviction relief and evidentiary hearing thereon, and the judgment of conviction.

To provide over-all background, we first summarize the facts as the jury could have found them in the light most favorable to the Commonwealth. We shall then summarize the judge's facts and conclusions on the defendant's original motion for a new trial, and thereafter proceed to resolve the defendant's claims that his trial counsel provided constitutionally ineffective assistance with respect to the issues of competency and mental impairment.

1. *Facts.* In the early evening of May 19, 1986, the defendant and Santos Lopez arrived separately at the apartment of the victim, Gilberto Nohoya, in Brockton. The three men were friends, and were immigrants from Cuba. The defendant had been living with the victim for several months.

The victim had been drinking vodka prior to the arrival of the defendant and Lopez. Shortly after the defendant had arrived, the victim began to argue with him. The argument lasted ten to fifteen minutes. It started inside and then moved outside. The victim produced a knife. The entire argument remained verbal, and the victim threw the knife to the ground. The defendant picked it up, brought it back inside, and placed it in the kitchen cabinet above the sink.

At some point, the victim disclosed that the following day was his birthday. In celebration, each of the men drank an entire bottle of champagne. In addition, the defendant and Lopez "snorted" cocaine three to four times. Later, the three men went for a ride in the defendant's automobile. The defendant took out a .22 caliber automatic pistol, and the three men took turns firing it into the air. When the men returned to the victim's apartment, the defendant put the pistol under a pillow in the bedroom.

At approximately 11:30 P.M., the defendant's cousin, Celia Vasquez, stopped by. The three men were drinking when she arrived and appeared to be drunk. Lopez asked Vasquez to give the victim a kiss for his birthday and she did. Vasquez went into

the bedroom with the victim and the defendant. The victim touched Vasquez, and the defendant got "a little bit upset."[3] Vasquez departed after about thirty minutes. After she left, the defendant and the victim did not argue.

Later, Brenda Elaine Gunderway, another friend of the defendant, stopped by to drop off the defendant's laundry. She remained for about fifteen minutes, during which time she had some champagne.

At approximately 2:20 A.M., now May 20, the defendant announced that he was going to go out and get "the pistol" so they could "try out the .38." He left the apartment, returning five minutes later. Lopez was sitting in a chair and the victim was standing in front of him. When the defendant returned, he said, "Let's go for a ride," and then fired once at the victim and once at Lopez. The victim was hit in the chest, and Lopez was hit in the finger. Lopez tried to escape out the back door, but it was locked. The defendant fired at him a second time, but missed. The defendant left. The victim died within a minute of being shot.

Lopez ran outside where he saw the defendant get into his car and drive away. Lopez ran to a public telephone and telephoned the police.

At about 3 A.M., the defendant went to Gunderway's nearby apartment, claiming to have lost his keys. Gunderway told him he could lay down on the couch. Vasquez arrived soon thereafter, and stayed until about 9 A.M. The defendant told Vasquez that he had shot the victim by accident.[4]

Brockton police found the .22 caliber pistol under a pillow in the bedroom of the victim's apartment. Later, at approximately 10 A.M., a police officer found the defendant under a blanket at Gunderway's apartment and arrested him.

Police recovered two spent .38 caliber bullets in the victim's apartment, and one spent .38 caliber bullet from the victim's

---

[3]Vasquez denied that the victim had touched her and that the defendant and the victim had exchanged words over it.

[4]Vasquez's trial testimony differed from her grand jury testimony. Before the grand jury, she stated that the defendant denied shooting the victim and had told her that he was not at the victim's apartment at the time of the shooting.

body. The bullets all had the same general "rifling system."[5] The murder weapon, which could not have been a .22 caliber automatic pistol, was never found.

Three days following the shooting, after the defendant had been arrested, he telephoned Lopez. The defendant told Lopez, in Spanish, to "forget about [the victim]" and then asked Lopez to "try to help him." One interpretation of the defendant's statement could have been, "I am in trouble, I'm accused of something I didn't do and only you can help me."

The defendant did not testify. He called one witness, the head of security for the Brockton housing authority, who testified that, at approximately 12:16 A.M. on May 20, he observed the defendant, victim, and Lopez outside the victim's apartment arguing with another man, and soon thereafter observed a woman leave the victim's apartment and get into an automobile parked nearby, joined thereafter by two men, including the man who had been arguing with the defendant, the victim, and Lopez. In closing, the defendant's trial counsel argued that the defendant did not shoot the victim; the Commonwealth's principal witnesses were not credible; that the defendant had no reason to leave the apartment to get a .38 caliber gun because he had ready access to a fully loaded .22 pistol; that, if the jury found that the defendant had shot the victim, that they also find that he was impaired when doing so by his use of alcohol and drugs; and that, if the jury found that the defendant shot the victim, it was an accident.

2. *Motion for a new trial.* After expressly crediting the testimony of the defendant's trial counsel, the trial judge dealt with the defendant's original motion for a new trial as follows.[6] Prior to trial, the defendant's trial counsel had been aware of the possibility of a "diminished capacity" defense based on a

---

[5]The Commonwealth's expert on firearms identification explained that a "rifling system" is "a number of lands and grooves that are cut into the bore of the barrel and given either a clockwise or counterclockwise rotation that acts to stabilize the bullet as it is fired down into [and] through the barrel."

[6]The defendant challenges several of the judge's factual findings and conclusions as clearly erroneous. It is unnecessary to address each particular challenge because the judge's material findings and conclusions are supported by the record.

mental disease or defect[7] and, for that reason, hired Dr. Robert F. Moore, a psychiatrist, to examine the defendant (for opinions concerning competency to stand trial and criminal responsibility). After reviewing Dr. Moore's report, trial counsel concluded that the "classic insanity defense" did not appear to be a viable option. Although he knew that the defendant had been admitted to Bridgewater State Hospital (Bridgewater) before trial, the defendant's trial counsel did not have Dr. Moore reevaluate the defendant, and did not seek another expert to evaluate the defendant.

Notwithstanding Dr. Moore's report, the defendant's trial counsel repeatedly talked to the defendant, through an interpreter, about the possibility of pursuing a "diminished capacity" defense based on a mental disease or defect. The defendant refused to allow such a defense, maintaining that he did not commit the crime and saying that "crazy people go to hell." Although trial counsel disagreed with the defendant's decision, on the defendant's insistence, the issue was not pursued.

In rejecting the defendant's claim that his trial counsel failed to investigate fully his mental impairment, the judge recognized that the defendant's trial counsel investigated the defendant's mental capacity by having a defense expert, Dr. Moore, evaluate the defendant. She took note of the "greater weakness" in the defendant's argument, namely, that nothing in the record indicated that, at the time of the shooting, the defendant lacked capacity to premeditate or to form the mental state required for malice. The judge concluded, "[g]iven the state of the record, specifically, the lack of evidence that [the defendant's] alleged mental defect may have prevented him from premeditating the crime or forming malice, as well as [the defendant's] persistent refusal to pursue such defense, it was not manifestly unreasonable for [the defendant's trial counsel] to fail to investigate further [the defendant's] mental defect."

---

[7]"There is no 'diminished capacity' defense in this Commonwealth." *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998). In accordance with *Commonwealth* v. *Gould*, 380 Mass. 672, 673 (1980), a defendant "may produce expert testimony on the issue whether or not the impairment of his mental processes precluded him from being able to deliberately premeditate."

The judge also concluded that the defendant's trial counsel's decision not to pursue a "diminished capacity" defense at trial based on mental disease or defect was not unreasonable considering the defendant's insistence that he was "not crazy" and that he did not kill the victim. She found that the defendant was competent to assist his attorney in his own defense,[8] that the defendant's trial counsel attempted to convince him to pursue a "diminished capacity" defense and communicated to him the potential impact of such a defense on the outcome of the case, and that the defendant voluntarily chose to forgo such a defense. The judge explained, "[the defendant] may not now, in hindsight, request a new trial and contend that his [trial] counsel was ineffective for following his orders." We now turn to the merits.

3. (a) *Competency*. The defendant argues that his first post-conviction counsel provided ineffective assistance by failing to raise the issue of the defendant's competence in his original new trial motion. The defendant acknowledges that, in dealing with this claim, the trial judge addressed the competence issue, concluding that the record supported the defendant's competency to stand trial. The defendant argues that this conclusion is wrong.

The defendant awaited trial in custody at the Plymouth County house of correction. Prior to trial, which commenced on April 15, 1987, and concluded on April 23, 1987, the defendant was evaluated three times, twice pursuant to a court order and once at the request of his trial counsel, to determine whether he was competent to stand trial, see G. L. c. 123, § 15 (*b*), and to determine whether he was fit to await trial in jail, see G. L. c. 123, § 18 (*a*). The first evaluation took place at Bridgewater on July 25, 1986, and was made by Dr. Jorge Veliz, the hospital's director of clinical services. Dr. Veliz examined the defendant pursuant to G. L. c. 123, §§ 18 (*a*) and 15 (*b*), diagnosing him with a "[s]chizo-affective [d]isorder" and

---

[8]The judge noted that the defendant's trial counsel never argued that the defendant was not competent to stand trial. She pointed out that not only did the defendant's trial counsel believe that the defendant was competent to stand trial, but two other doctors, including Dr. Moore, had found the defendant competent to stand trial.

cocaine abuse and dependency, but concluding that he was competent to stand trial and did not require admission to the hospital pending trial.

The defendant was next evaluated on September 18, 1986, for competency by Dr. Moore, who had been retained by the defendant's trial counsel. Dr. Moore remarked that he did "not see substantial evidence of a [m]ajor [m]ental [d]isorder" in the defendant, and diagnosed him as having a mixed personality disorder. Dr. Moore concluded that the defendant was competent to stand trial.

On December 26, 1986, a psychologist, Dr. Leonard Bard, the assistant medical director of Bridgewater, evaluated the defendant pursuant to G. L. c. 123, § 18 (*a*). Dr. Bard diagnosed the defendant as having a "major mental illness," namely, paranoid schizophrenia. Dr. Bard stated that the defendant's condition "is somewhat controlled with psychotropic medications," and he concluded that the defendant should be returned to the house of correction to await trial. In connection with her finding that the defendant was able to waive a defense based on mental impairment, the trial judge concluded:

> "[The defendant's trial counsel] never argued that [the defendant] was not competent to stand trial. In fact, not only did [the defendant's trial counsel] believe that [the defendant] appeared to understand the nature of the proceedings but Dr. Veliz and Dr. Moore also found [the defendant] competent to stand trial. . . . Following his own judgment, which was wholly supported by the evaluation of his expert, Dr. Moore, [the defendant's trial counsel] never raised the issue of [the defendant's] competency to stand trial."

To support his present contention that his trial counsel should have requested a competency determination at the time of trial, the defendant relies on "evidence of incompetency," which can be characterized as follows: (1) records pertaining to the defendant's admission to Bridgewater on three occasions prior to trial; (2) the fact of the defendant's incarceration "the last month prior to trial" (as distinguished from an admission to Bridgewater); (3) an opinion that the stress of the impending

trial worsened the defendant's mental condition; (4) the "observations" of the defendant's trial counsel; and (5) the defendant's postconviction admission to Bridgewater, in December, 1987, and finding of incompetence to serve his sentence in prison for a period of approximately twenty months. Relying on *Commonwealth v. Hill,* 375 Mass. 50 (1978), the defendant maintains that the competency determinations made by Drs. Velez and Moore are undermined by the fact that their evaluations took place several months before trial and are further undermined by the defendant's postconviction commitment to Bridgewater. We reject the defendant's arguments.

"It has long been the law of this Commonwealth that the 'trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process' (footnote omitted), whether under the Fourteenth Amendment to the Constitution of the United States or under art. 12 of the Declaration of Rights of the Constitution of this Commonwealth." *Commonwealth v. Hill, supra* at 51-52, quoting *Commonwealth v. Vailes,* 360 Mass. 522, 524 (1971). "[T]he Commonwealth bears the burden of proving, by a preponderance of the evidence, that a defendant is competent to stand trial." *Commonwealth v. Serino,* 436 Mass. 408, 414 (2002). The standard for determining competency "is framed in terms of the defendant's functional abilities: 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.' " *Commonwealth v. Goodreau,* 442 Mass. 341, 350 (2004), quoting *Commonwealth v. Russin,* 420 Mass. 309, 317 (1995). The inquiry "is not why counsel failed to request a competency hearing or why the court failed to hold one on its own initiative, but whether, no less on hindsight than by foresight, there were elements of such indication in the situation as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [the defendant's] competency to stand trial." *Commonwealth v. Hill, supra* at 54, quoting *Rhay v. White,* 385 F.2d 883, 886 (9th Cir. 1967).

None of the defendant's so-called "evidence of incompe-

tency" creates a "substantial question of possible doubt" on the issue of competency. See *Commonwealth* v. *Robbins,* 431 Mass. 442, 448 (2000). In his report finding the defendant competent to stand trial, Dr. Veliz accurately refers to the circumstances of the defendant's first admission to Bridgewater. While Dr. Moore may not have examined the actual records pertaining to the defendant's first Bridgewater admission, he indicated that he had read and considered Dr. Veliz's report. Dr. Bard did not evaluate the defendant for competency to stand trial but, in his report, noted the circumstances of the defendant's second admission to Bridgewater, taking care to reference, correctly and specifically, relevant material in the initial admission note as well as a subsequent progress note.

The defendant's last pretrial admission to Bridgewater discloses nothing of significance. The purpose of the defendant's admission was to determine, pursuant to G. L. c. 123, § 18 (*a*), whether he was fit to await trial in a penal setting, because he had been "unmanageable in jail." The admission note consists of one-half of one page of text, and notes the following: "Mood not depressed. No delusions. Affect normal range. Denies hallucinations. States he wanted some air in his cell. States he 'put a fire in the hallway' and this incident resulted in his being sent here." The defendant was transferred back to the house of correction on March 2, 1987. None of the records from these three pretrial hospital admissions discloses any information that had not already been noted, and considered, by Drs. Veliz, Moore, and Bard, or which was not cumulative of their prior findings and diagnoses or altogether insignificant.

While incarceration of a mentally ill person prior to trial may result in "further problems" for that person, speculation that it did so here is undermined by the fact that the defendant's return to the house of correction on March 2, 1987, conformed to the recommendations of the Bridgewater staff. See *Commonwealth* v. *Hill, supra* at 58. Speculation, such as the defendant's statement that "it is likely that the stress of the impending trial caused [the defendant's] condition to worsen," is not relevant to a determination of competency.

The defendant concedes that his trial counsel's observations and ultimate awareness, or lack thereof, of a competency issue

is "ultimately irrelevant." He goes on, however, to contend that "[w]here a defendant facing a first degree murder charge has been diagnosed with a major mental illness, and yet refuses to discuss an insanity defense, this fact alone establishes beyond any doubt that the defendant is not malingering and that there is a 'substantial question of possible doubt' as to his competence." We previously rejected such a contention, see *Commonwealth* v. *Serino, supra* at 416. The contention also ignores the effect of any prescribed medications taken by a defendant to ameliorate his mental illness, see *Commonwealth* v. *Goodreau, supra* at 351. In this case, the defendant had such medications (Dr. Bard, on December 26, 1986, indicated that the defendant's paranoid schizophrenia "is somewhat controlled with psychotropic medications").

The time frame for determining a defendant's competency to stand trial is "the condition of the defendant at the time of trial." See *Commonwealth* v. *Hill, supra* at 62. The defendant's postconviction admission and commitment to Bridgewater is essentially irrelevant. A competency evaluation made contemporaneously with trial would have been preferable, see *id.* at 58. In the final analysis, we note that (1) the facts are distinguishable in material respects from what occurred in the *Hill* case,[9] (2) the defendant has not submitted any expert testimony indicating that he was not competent to stand trial,[10] and (3) at the evidentiary hearing on his original motion for a new trial, the defendant testified and made no claim that he was unable to understand the nature of the proceedings against him or to consult adequately with his trial counsel. The defendant may have been diagnosed, prior to trial, with a psychiatric condition, but, despite that condition, he was competent to stand trial. *Com-*

---

[9]For instance, in *Commonwealth* v. *Hill*, 375 Mass. 50, 58 (1978), the defendant's incarceration prior to trial contravened the recommendations made by Bridgewater's medical staff. In addition, the defendant in that case, whose trial commenced in May, 1973, had a "long history of treatment in mental hospitals . . . manifested by extensive medical and psychiatric records . . . indicat[ing] that, since 1936, the defendant had been hospitalized frequently at Bridgewater State Hospital, Medfield State Hospital, and Boston Psychopathic Hospital." *Id.* at 55, 57.

[10]A posttrial expert opinion would not compel a conclusion that a defendant was incompetent to stand trial. See *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 469 (1998).

*monwealth* v. *Robbins, supra* at 448. The present record does not show a "substantial question of possible doubt" about the defendant's competency. See *id.*

(b) *Mental impairment.* The defendant also contends that his trial counsel acted improperly by not presenting evidence that mental impairment deprived the defendant of the ability to form the specific intent to kill and to deliberately premeditate, and, that as a result of this failure, he was denied a substantial ground of defense. We do not agree.

As has been pointed out, the defendant's trial counsel did, in fact, have the defendant evaluated prior to trial by a psychiatrist, Dr. Moore. This fact alone distinguishes this case from *Commonwealth* v. *Roberio*, 428 Mass. 278, 279 (1998), in which that defendant's trial counsel "made his own assessment of the defendant's mental health," and purposefully did not ask the defendant to submit to a psychiatric evaluation.

The defendant essentially acknowledges that the judge correctly exposed the "greater weakness" in the defendant's claim, namely, the failure to present any expert opinion testimony that, on the date of the shooting, the defendant lacked the mental capacity, by reason of mental illness or defect or the combined effects of mental illness and intoxication, to form the specific intent to kill. From this deficiency alone, we conclude that the judge correctly rejected the defendant's claim of ineffective assistance of trial counsel. See *Commonwealth* v. *Laguer*, 410 Mass. 89, 93-94 (1991).

Further, as found by the judge, the defendant's trial counsel's decision to forgo pursuit of a "diminished capacity" defense based on mental disease or defect was not unreasonable in light of the fact that it was based on the defendant's personal choice against the advice of counsel. See *Commonwealth* v. *Federici*, 427 Mass. 740, 744-745 (1998). See also *Commonwealth* v. *Tevlin*, 433 Mass. 305, 316-317 (2001), and cases cited. While the judge did not advise the defendant of the consequences of his decision, the defendant, as previously discussed, was competent to stand trial and to assist in his own defense, and he discussed the matter with his trial counsel. See *id.* That a different set of facts could have been found by the judge is inconsequential. The judge expressly discredited the defendant's

testimony at the evidentiary hearing. Further, the record does not support the defendant's contention that trial counsel's discussions with him were limited to an insanity defense or that the discussions occurred only on the day of trial and were not meaningful.

For the first time, the defendant argues that his "post-conviction counsel" should have procured expert testimony that, at the time of the shooting, the defendant lacked the mental capacity to deliberately premeditate. Asserting that because one expert (Dr. Daniel M. Weiss, who died before the evidentiary hearing on the motion for new trial) "had already opined that [the defendant] lacked the mental capacity to form the specific intent to kill," the defendant reasons that "it should have been obvious that counsel could find another mental health professional who would come to the same conclusion." We reject the argument. There are no affidavits from prior appellate counsel on the issue, see *Commonwealth* v. *Rice*, 441 Mass. 291, 304 (2004), and a close examination of Dr. Weiss's affidavit discloses, contrary to the defendant's representations, that Weiss's proposed trial testimony was conditioned on "pending test[] results" and pertained to the elements needed to satisfy an insanity defense under *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

Finally, we discern no error in the denial of the defendant's request for an evidentiary hearing on his amended motion for postconviction relief. Dr. Bard's new affidavit identifies no cause, or combination of causes, for the defendant's inability to form a specific intent to kill or to deliberately premeditate. No substantial issue was raised. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). See also *Commonwealth* v. *Roberio*, 428 Mass. 278, 280-282 (1998); *Commonwealth* v. *Beattie*, 409 Mass. 458, 459 (1991).

4. *Remaining claims.* The defendant's remaining claims lack merit. (a) The defendant's trial counsel did not furnish ineffective assistance by failing to request that the prospective jurors be individually examined to ascertain whether any of them harbored bias toward Cubans. The defendant, the victim, and most of the percipient witnesses in the case were Cuban immigrants. There is no suggestion in the record that ethnicity

or immigration status had any particular significance or played any part in the killing. This case is not in the category of cases where individual juror voir dire would be required because of a reasonable possibility that a specific form of prejudice might influence the jury's verdict. See *Commonwealth* v. *Pina*, 430 Mass. 66, 73-74 (1999), and cases cited. No other factor has been shown that might dictate prudence on the part of the defendant's trial counsel in requesting an individual voir dire.

(b) The prosecutor's brief references in his closing argument on how intoxication might affect premeditation and malice create no substantial likelihood of a miscarriage of justice in view of the judge's clear instructions on premeditation and the effect of intoxication.

(c) There is nothing in the challenged jury instructions to require a new trial.

(i) The judge's mention, at the start of the substantive instructions, that, under G. L. c. 265, § 1, murder in the first degree could be committed by reason of deliberate premeditation, by extreme atrocity or cruelty, or by felony murder, did not create the possibility that the jury may have convicted the defendant on one, or both, of the last two theories. The case was tried solely as a case involving deliberate premeditation. See note 1, *supra*. There was no evidence presented on either extreme atrocity or cruelty or on felony-murder. Neither of these theories was argued to the jury by the prosecutor or rebutted in closing by the defendant's trial counsel. After generally paraphrasing G. L. c. 265, § 1, the judge instructed the jury solely on the elements of premeditated murder in the first degree, and made it clear to the jury that the defendant was charged only with "having committed murder with deliberately premeditated malice aforethought."

(ii) The judge's detailed and accurate instructions on deliberate premeditation, together with the nature of the shooting, eliminate any likelihood of a miscarriage of justice with respect to the third prong malice instruction, which contained language often given by judges in 1987, but since removed from the instruction. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 587 & n.12 (2001), and cases cited.

(iii) The judge's instructions on the elements of involuntary manslaughter and on accident contain no error.

(iv) The judge's instructions on the effect of intoxication on the defendant's culpability were correct and suitable to the only theory of murder that was tried before, and decided by, the jury.

5. There is no basis to exercise our power under G. L. c. 278, § 33E, to order the entry of a lesser degree of guilt or a new trial. Despite the defendant's mental problems and his consumption of alcohol on the night of the killing, there was evidence of animosity between the defendant and the victim, the defendant's deliberate choice to obtain a higher caliber handgun, and the defendant's purposeful firing of three shots, one of which killed the victim, the second of which struck Lopez, and the third of which missed both of them. The jury were justified in concluding that the defendant had committed murder in the first degree.

6. The orders denying the defendant's motion for a new trial, amended motion for postconviction relief, and for an evidentiary hearing on the latter motion are affirmed. The judgment of conviction is affirmed.

*So ordered.*