# United States Court of Appeals

## For the First Circuit

No. 10-1239

JACQUES ROBIDOUX,

Petitioner, Appellant,

v.

STEVEN J. O'BRIEN, Superintendent,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Circuit Judge,

Souter,* Associate Justice,

and Selya, Circuit Judge.

Janet Hetherwick Pumphrey for appellant.
Susanne G. Reardon, Assistant Attorney General, Criminal
Bureau, with whom Martha Coakley, Attorney General, was on brief
for appellee.

June 28, 2011

---

*The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**BOUDIN, Circuit Judge**. Jacques Robidoux was convicted in Massachusetts state court for the murder of his eleven-month-old son for which he is serving a life sentence. He now seeks review of the district court's denial of his federal petition for habeas corpus. 28 U.S.C. § 2254 (2006). The central question is whether his trial counsel, Francis O'Boy, provided competent representation. A brief summary of background events and earlier proceedings is a preface to several difficult legal issues.[1]

Robidoux's father led a religious sect that included Robidoux and his wife, Karen. One of his father's beliefs was that a number of ordinary institutions, including the legal system, the medical system, and mainstream religion, were invalid--indeed, among "Satan's seven counterfeit systems"--and members of the sect were instructed to eschew doctors and medicines.

On April 29, 1998, Robidoux's son, Samuel, was born without complication to his wife Karen. Samuel was healthy: he was described by family members as "active" and "robust"; in January 1999, when he was eight months old, he was reported to eat "willingly anything that was put in front of him"; and he was able to sit and had begun walking by grabbing onto furniture.

---

[1]The facts are drawn mostly from the Massachusetts Supreme Judicial Court's ("SJC") decision upholding Robidoux's conviction, Commonwealth v. Robidoux, 877 N.E.2d 232 (Mass. 2007), supplemented where necessary with facts from the record that are consistent with the SJC's findings. See Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir.), cert. denied, 549 U.S. 892 (2006).

In early March 1999, one of Robidoux's sisters claimed to receive a "leading"--what the sect deemed a revelation from God to live life in a certain manner--that Karen was to nurse Samuel for ten minutes on each breast every hour and eliminate all other sources of food from Samuel's diet. This regime, endorsed by Robidoux's father, was adopted by Robidoux and his wife.

In consequence, Samuel began to fail from lack of proper nourishment. Samuel's deterioration was manifest--and its dreadful character and his suffering were portrayed at the later trial--but Robidoux and Karen did not take Samuel to a doctor or relax his dietary restrictions. Rather, Robidoux called a special meeting of the sect in late April 1999 to pray in the hope of improving Samuel's condition.

The next day, Robidoux informed the sect of Samuel's death. He concealed the body in the bulkhead of a sister's home and months later buried it in Baxter State Park in Maine. The police learned of events from an ex-member of the sect and recovered Samuel's remains about a year after the secret burial. A state grand jury in Massachusetts indicted Robidoux for first-degree murder; his wife was indicted for second-degree murder. Robidoux was tried, separately from Karen, in a nine-day trial in June 2002. O'Boy, who had practiced law in Massachusetts for nearly forty years, served as trial counsel for Robidoux.

At trial, O'Boy's main defense was to argue that starvation was not the proven cause of death. Robidoux's expert witness, a pediatric forensic pathologist, testified that Samuel may have died from any number of causes other than starvation. For the state, Maine's chief medical examiner testified that Samuel's cause of death was severe malnutrition due to starvation; a forensic anthropologist pointed to abnormalities in Samuel's bones consistent with malnutrition; and a pediatrician described Samuel's deterioration as consistent with malnutrition.

Robidoux himself chose to testify, admitting some facts helpful to the prosecution but also offering statements that might induce some sympathy. He admitted seeing adverse changes in Samuel after the dietary restrictions began and conceded that Samuel's deteriorating health was "based on his not getting enough nourishment." However, Robidoux denied any intent to harm the child, saying that the death was a "product of mistakes and misunderstandings," and he took responsibility for Samuel's death, saying that "[t]he buck stops here."

During his closing argument, O'Boy attempted to turn Robidoux's candor to the defense's advantage, arguing that Robidoux was courageously attempting to "take the bullet for the rest of the family." O'Boy implored the jury not to let Robidoux become the scapegoat for the prosecution, but rather to "judge the man." He concluded his closing statement suggesting that Robidoux did not

cause Samuel's death, that the cause of death remained debatable, and that, given his candor, Robidoux was no hardened criminal.

On June 14, 2002, one day after the case went to the jury, the jury found Robidoux guilty of first degree murder by reason of extreme atrocity or cruelty, and on that same day, the trial court sentenced Robidoux to life imprisonment. Robidoux ultimately filed two post-trial motions for relief; both were denied by the trial judge.

The first, prepared shortly after the verdict by O'Boy, was a motion for a required finding of not guilty or for a new trial; it alleged, inter alia, that the judge failed properly to charge the jury on Massachusetts' "third prong" malice element, discussed below. The second motion, prepared in 2005 by new counsel for Robidoux, was also for a new trial, and charged, inter alia, that O'Boy had provided inadequate representation. The second motion included three affidavits pertinent here.

One was by a psychologist who gave his opinion that Robidoux was unable to appreciate or understand that it was wrong to deprive his son of solid food, although he admitted that he had never interviewed Robidoux.[2] A second affidavit was by Robidoux himself, who stated that O'Boy "discussed with [him] the various

_____

[2]The psychologist's opinion was based on an examination of Karen and his research of cults generally in preparation for Karen's trial. Karen later was acquitted of second-degree murder, after arguing that she had been psychologically battered within the sect, but was convicted of assault and battery.

-5-

ways to try [his] case, including the insanity defense," but that there was "simply no way that [Robidoux] would talk to a doctor or a psychotherapist" prior to the trial because of his religious beliefs.

The third affidavit was by the director of the New England Institute for Religious Research, who had been the court-appointed guardian ad litem in the care and protection case brought by Massachusetts against the sect. Based on interviews with Robidoux and other materials, the affiant gave his opinion that undue influence was being exercised over Robidoux by his father and other sect members that made it impossible for counsel to present an adequate defense.

In rejecting the motion, the state trial judge found that trial counsel had properly defended the case. The judge said that, based on her own observation of Robidoux in court and the cogency of his answers and trial testimony, he was entirely competent to stand trial. The trial judge also had earlier said that Robidoux's rambling eve-of-trial motion to represent himself--described in more detail below--was a tactic to secure a delay. On direct appeal, the SJC upheld Robidoux's conviction.

Robidoux then sought federal habeas relief, 28 U.S.C. § 2254, which the federal district court in turn denied. Robidoux v. O'Brien, Civ. No. 08-11046-RGS, 2010 WL 559107 (D. Mass. Feb. 11, 2010). However, the court granted a certificate of

appealability, 28 U.S.C. § 2253(c), as to whether O'Boy had provided ineffective assistance in failing "to request a mental evaluation and a competency hearing"; on Robidoux's motion, we expanded the certificate to include trial counsel's failure to press a defense based on insanity or diminished capacity.

All three of these issues were addressed by the SJC on the merits and the claims were rejected; indeed, the SJC affirmed that Robidoux had been competent to stand trial. Customarily, where the state court has addressed the constitutional issues and applied standards at least as generous to the defendant as those imposed by the federal constitution, federal review is limited in two respects by the current habeas statute.

First, as to law or the application of legal standards to settled facts, habeas relief cannot be granted unless the defendant shows that the state court's decision was "contrary to" or "involved an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). Second, if the issue is one of fact, the defendant must show that it "was based on an unreasonable determination of the facts" in light of the record before it. Id. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) (clear and convincing evidence standard).[3]

---

[3]We have previously declined to delve into the relationship between subsections (d)(2) and (e)(1), Forsyth v. Spencer, 595 F.3d 81, 84 n.3 (1st Cir. 2010), as has the Supreme Court, Wood v. Allen, 130 S. Ct. 841, 848-49 (2010); cf. Rice v. Collins, 546 U.S. 333, 339 (2006), and again have no need to do so.

Robidoux's competency. Each of the three certified questions on appeal concerns O'Boy's representation rather than Robidoux's competence to stand trial. And, while the second motion in state court focused primarily on O'Boy's failure to pursue an insanity defense, Robidoux's brief in this appeal has shifted the emphasis to O'Boy's failure to seek a competency hearing. Robidoux's competency itself is not the issue before us, save as evidence as to how it may bear on O'Boy's responsibilities or might furnish a basis for finding a lack of prejudice.

The governing federal standard for all three of Robidoux's claims is that set forth in Strickland, which requires proof both that counsel fell below minimum standards of representation and that there is a reasonable probability that the deficiency altered the outcome of the case. See Strickland v. Washington, 466 U.S. 668, 687-96 (1984). The choice whether to pursue an insanity or diminished capacity defense turns in part on defense counsel's choice of strategy, and for obvious reasons counsel's strategy judgments are ordinarily given special deference. See id. at 689; Genius v. Pepe, 147 F.3d 64, 66 (1st Cir. 1998), cert. denied, 526 U.S. 1121 (1999).

By contrast, where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation under Massachusetts law, Commonwealth v. Simpson, 704 N.E.2d 1131, 1136

-8-

(Mass. 1999); Commonwealth v. A.B., 887 N.E.2d 1107, 1112 (Mass. App. Ct. 2008), and under federal law as well, see, e.g., Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001); United States v. Boigegrain, 155 F.3d 1181, 1188 (10th Cir. 1998), cert. denied, 525 U.S. 1083 (1999), to raise the issue with the trial judge and ordinarily to seek a competency examination.

This is perhaps surprising, if stated as an invariable rule, because that course could sometimes be adverse to the client's interest; the obvious instance is the case of an incompetent defendant with an excellent merits defense. Nevertheless, this obligation has been deemed necessary to the dignitary interests of defendants and the integrity of the trial process, see ABA Criminal Justice Mental Health Standards § 7-4.2(c), at 176 (1989), and if there are exceptions, none has been invoked here.

Yet "competency" in this context is a comparatively narrow concept and must not be confused with broader or different uses of the term. It is not the same as whether the defendant has an insanity or diminished capacity defense on the merits or whether his ideas about how to live or what to believe are common in the community or seem sensible to others. Rather the competency insisted on by the courts is a functional concept focusing on the defendant's part in the trial.

The two settled requisites of competency are that the defendant understand the nature of the proceedings against him and that he be able to cooperate with counsel in his defense. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v. Missouri, 420 U.S. 162, 171-72 (1975). The "understanding" required is of the essentials--for example, the charges, basic procedure, possible defenses--but not of legal sophistication. One of the jobs of counsel--and, in limited respects, the judge--is to explain matters to the defendant, and it is that understanding that is required.

There is only a single piece of direct evidence to suggest that Robidoux might not have understood what he was told. Robidoux tendered on the first day of trial and withdrew the next day a long, rambling and (judged by conformity to legal principles) almost incoherent request to proceed pro se and to change his plea based on some sort of lack of jurisdiction argument. However, the core argument in the motion is one familiar to federal judges, namely, that somehow the government and courts have no legitimate authority over the defendants.[4]

This is a misunderstanding of the law, but it seems to be a common illusion among certain groups alienated from society and

---

[4]E.g., United States v. Drachenberg, 623 F.3d 122, 124 (2d Cir. 2010); United States v. Gerhard, 615 F.3d 7, 25 (1st Cir. 2010), cert. denied, 131 S. Ct. 1536 (2011); United States v. Cooper, 170 F.3d 691, 691 (7th Cir. 1999); United States v. Mundt, 29 F.3d 233, 237 (6th Cir. 1994); United States v. Collins, 920 F.2d 619, 629 (10th Cir. 1990) (citing cases), cert. denied, 500 U.S. 920 (1991).

is often reflected in doctrinal writings parroted in pleadings.  It does not prevent a defendant from knowing that the government has put him on trial, recognizing the procedures to be used, or appreciating advice that lack of authority claims will not constitute an effective defense.  Thus,

> [m]any litigants articulate beliefs that have no legal support--think of tax protesters who insist that wages are not income, that taxes are voluntary, or that only foreigners must pay taxes . . . . Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect . . . so deficient that trial is impossible.

United States v. James, 328 F.3d 953, 955 (7th Cir. 2003); accord United States v. Landers, 564 F.3d 1217, 1222 (10th Cir.), cert. denied, 130 S. Ct. 198 (2009).

Robidoux proved in court to be intelligent and articulate in colloquies with the judge and as a witness.  Nothing in his affidavit shows that he did not understand the proceedings; his post-trial psychologist's affidavit bears only on the insanity defense; and the third affidavit simply expresses the view that Robidoux may have been unduly influenced in deciding on his defense strategy by others in the sect who contacted him in prison.

As for cooperating with counsel, this does not require that the defendant go along with his lawyer's advice, nor do we know that anything Robidoux did was against that advice.  His brief now suggests that his testimony undercut O'Boy's causation defense;

-11-

but his testimony was not critical to prove what had happened, and his admission to "mistakes" and acceptance of "responsibility" for the death appear a shrewd way of indirectly seeking to negate the intent element of the crime, in addition to expressing remorse.

What is more, the question is not whether we think that counsel should have raised the competency issue but whether the SJC was "unreasonable" in concluding that in the circumstances he did not have to do so. 28 U.S.C. § 2254(d)(2). We can hardly find the SJC decision unreasonable when there is little evidence anywhere that Robidoux failed to understand the proceedings and virtually none that he was unable to cooperate with counsel.

Affirmance could also rest on an alternative ground. Even if O'Boy should have raised the competency issue, the SJC found that Robidoux was competent, so it is difficult to see how counsel's supposed error could have satisfied the prejudice requirement of Strickland. Robidoux says that a finding of competence is not subject to deference because it was not based on an evidentiary hearing but rather on the trial judge's statement and the SJC's inferences, but this is a dubious position.

Case law is divided on whether, when, and to what extent lack of an evidentiary hearing in the state court might undercut the deference to state fact-finding that is due under the habeas

statute.[5]  Section 2254(d)(2)'s current language contains no requirement of a hearing.[6]  We found no direct First Circuit precedent, but the answer must be that evidentiary hearings cannot always be required--they are not always required in federal courts either, e.g., United States v. Marquardo, 149 F.3d 36, 46 (1st Cir. 1998) (contempt proceeding)--and it is far from clear that the state finding here is made unreasonable by the lack of one.

We need not resolve this point because Robidoux's counsel has not gone beyond the flat assertion, which we reject, that a state court finding gets no deference absent an evidentiary hearing.  It is enough to note that the trial judge was familiar with Robidoux's conduct, conducted colloquies with him in the courtroom, watched him as a witness at trial, and was aware that he had no known diagnosed history of mental illness.  Nor had there been any complaints from O'Boy.

Insanity defense.  Next challenged is O'Boy's failure to raise the insanity defense.  Unless incompetent, Robidoux was

---

[5]Compare Wilson v. Workman, 577 F.3d 1284, 1292 (10th Cir. 2009) (en banc), and Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004), with Lambert v. Blackwell, 387 F.3d 210, 238 (3d Cir. 2004), cert. denied, 544 U.S. 1063 (2005), and Mendiola v. Schomig, 224 F.3d 589, 592-93 (7th Cir. 2000), cert. denied, 533 U.S. 949 (2001).

[6]Prior language granted the presumption of correctness only to facts determined "after a hearing on the merits of a factual issue," 28 U.S.C. § 2254(d) (1994), superseded by Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 104, 110 Stat. 1214 (1996).  See generally Valdez v. Cockrell, 274 F.3d 941, 949-50 (5th Cir. 2001), cert. denied, 537 U.S. 883 (2002).

entitled to decline to assert the defense and to refuse any psychiatric examination to support it. Commonwealth v. Murphy, 813 N.E.2d 820, 834-35 (Mass. 2004); Commonwealth v. Federici, 696 N.E.2d 111, 114-15 (Mass. 1998). Robidoux made clear that he did not wish to be examined by doctors. Whether he ever told his lawyer expressly not to assert an insanity defense is less clear.

Robidoux's refusal to be examined would in any event allow, and likely lead, the trial judge to bar Robidoux's counsel from offering an expert witness of his own. Mass. R. Crim. P. 14(b)(2), (c)(2); Commonwealth v. Guadalupe, 516 N.E.2d 1159, 1161-62 (Mass. 1987). If not forbidden, counsel might still have asserted the insanity defense without an expert, Commonwealth v. Gaboriault, 785 N.E.2d 691, 700 (Mass. 2003); Commonwealth v. Mattson, 387 N.E.2d 546, 550 (Mass. 1979), and urged that Robidoux did not appreciate that his withholding of solid food was "wrongful." Under Massachusetts law:

> A person is not responsible for criminal
> conduct if at the time of such conduct as a
> result of mental disease or defect he lacks
> substantial capacity either to appreciate the
> criminality [wrongfulness] of his conduct or
> to conform his conduct to the requirements of
> law.

Commonwealth v. Mercado, 896 N.E.2d 1262, 1265 n.2 (Mass. 2008) (quoting Commonwealth v. McHoul, 226 N.E.2d 556, 557-58 (Mass. 1967)).

But insanity is normally rooted in some recognized mental illness.  Nothing indicated that Robidoux had ever been so diagnosed or even cleanly fit into a standard, recognized category of mental illness.  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994), has ambiguous language on delusional disorder that might or might not be useful to Robidoux, id. at 297.1, but it is unclear that the volume would even be admissible without an expert.

In this court, Robidoux's counsel now argues that insanity was patent based on two of Robidoux's religious illusions: that God and prayer, not ordinary nourishment, would protect Samuel and--in a similar but less disastrous prior episode--that God, rather than gasoline refills at pumps, would fuel the cars in a caravan that Robidoux led on a religious trek that ended in a fiasco of stalled cars.  Experience gives good reason to think that such illusions are rarely an effective argument for insanity.

In our diverse religious cultures, Christian Scientists are often committed to resist conventional medical treatment in situations even where the results can be dire, and Jehovah's Witnesses may oppose blood transfusions even where doctors say this is essential.  Judges and juries rarely treat these beliefs as representing insanity, and the case law contains numerous

rejections of the use of religious belief as a complete defense in the resulting criminal or civil case.[7]

There is one case, akin in structure but not in its facts, that is worth comment even though not cited to us. In Wilson v. Gaetz, 608 F.3d 347 (7th Cir. 2010), Judge Posner found that the facts attending a case were so powerfully indicative of a possible insanity defense that counsel had been deficient under Strickland in not pursuing the issue; the case was remanded to consider whether prejudice had been shown. Id. at 356-57. The analysis is cogent and powerful, although even on the extreme facts there was still a dissent.[8]

The defendant in Wilson was a classic paranoid schizophrenic who refused to leave home under the delusion that there was a vast religious conspiracy against him and killed his employer, professing that the employer was implicated in the conspiracy. 608 F.3d at 348-50, 354. Because the defendant had been subject to a competency hearing, expert evidence was

_____

[7]See generally 1 W. LaFave, Substantive Criminal Law § 3.3(a)(1), at 284 n.9 (1986) (citing criminal cases); 2 id. § 7.12(a), at 281 n.28 (same). In Massachusetts, there is at least one such criminal case, Commonwealth v. Twitchell, 617 N.E.2d 609 (Mass. 1993), and there are several such civil cases, e.g., Matter of McCauley, 565 N.E.2d 411 (Mass. 1991); Custody of a Minor, 379 N.E.2d 1053 (Mass. 1978).

[8]Judge Posner provides, with customary thoroughness, extensive discussion of and citations to the so-called "deific decree" defense--misnamed because it is not a formal defense but the use of religious delusions in connection with some recognized issue (intent) or defense (insanity). Wilson, 608 F.3d at 354.

-16-

available; but counsel, who did offer an insanity defense, mishandled it by focusing on it too late and by failing to get more precise expert testimony or to interview the defendant's family members familiar with his extensive mental health history. Id. at 351-52.

By contrast, O'Boy had no history of diagnosed mental illness to work with and no expert psychiatric evidence (nor much chance of getting it so long as Robidoux refused to be examined). On appeal, his new counsel argues that this refusal was itself evidence of insanity; but a mistaken religious belief with adverse consequences for the believer is hardly by itself insanity. The SJC judgment of adequate representation was not unreasonable, and again nothing establishes that offering the defense would have worked. Cf. Lundgren v. Mitchell, 440 F.3d 754, 773 n.6 (6th Cir. 2006) (discussing "deific decree" insanity defense cases and concluding that the defense almost never works).

Diminished capacity. The third ineffective assistance claim is that O'Boy failed unreasonably to argue diminished capacity. There is no formal diminished capacity defense in Massachusetts, but it is settled that the defendant may offer evidence and argument bearing on his ability to form the necessary intent for the crime in response to the government's affirmative case. Commonwealth v. Companonio, 833 N.E.2d 136, 141 n.7 (Mass. 2005).

Here, Robidoux's good faith religious belief might appear at first blush to be a colorable basis for arguing to the jury that he did not have "intent" in the sense of a conscious awareness that he was following a course likely to lead to his son's death. Thus, prosecutions for withheld medical care based on religious belief may result in conviction for manslaughter rather than murder. However, such a no-intent argument assumes that the jury would accept that Robidoux was unaware of the risk that his behavior posed to his son, but the prosecution had evidence that Robidoux did understand that risk.

Most telling was a diary entry that Robidoux wrote accepting that his son was getting worse on the prescribed diet but saying that if the son died he would be resurrected after death. The other, connected to his wife's trouble in producing milk, was firm evidence from several sources that Robidoux knew that his son was not getting enough nourishment. A jury could well have concluded that Robidoux understood causation but believed that God had forbidden Samuel solid food even if this would cause Samuel's death--a view that would do nothing to negate intent.

Worse still, Massachusetts now has a murder statute that leans heavily on intent, Mass. Gen. Laws ch. 265, § 1 (2008), but its judicial decisions have added a gloss dangerous to Robidoux. That gloss, e.g., Commonwealth v. Earle, 937 N.E.2d 42, 47-51 (Mass. 2010); cf. Commonwealth v. Chance, 54 N.E. 551, 554-55

-18-

(Mass. 1899) (Holmes, C.J.), is incorporated in standard jury instructions, which provide an alternative "third prong" malice basis for scienter in murder cases:

> Malice, for purposes of this theory of murder also includes: 3) an intent to do an act, which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. Under this third meaning of malice, you must determine whether, based on what the defendant actually knew at the time he acted, a reasonable person would have recognized that his conduct created a plain and strong likelihood that death would result. In determining whether the Commonwealth has proved this third meaning of malice, you must consider the defendant's actual knowledge of the circumstances at the time he acted.

Mass. Model Jury Instructions on Homicide 12 (1999). A jury could easily conclude that this language inculpates someone like Robidoux, who might believe that his action would not cause death but is objectively unreasonable in so believing. O'Boy tried several times but (almost inevitably) failed to get a modified instruction from the trial judge.

By making the argument in his own terms ("mistakes were made"), Robidoux may have hoped that he could negate murderous intent in the jury's mind; and by his oblique use of this testimony in his own closing, O'Boy might well have thought that he could reinforce the point without running directly into the factual evidence harmful to Robidoux and the even more dangerous

-19-

instruction. Anyway, O'Boy's subtler approach was not incompetent, and the more direct argument would likely not have succeeded.

On appeal, Robidoux's diminished capacity argument is not quite the obvious one set forth above but is an even less promising variant: that by arguing diminished capacity, Robidoux might have been convicted of second rather than first-degree murder. The argument depends on an SJC decision, Commonwealth v. Gould, 405 N.E.2d 927, 928 (Mass. 1980), that treated delusions short of an insanity defense as relevant to "extreme atrocity or cruelty," which if negated might result in only second-degree murder.

But that case involved expert testimony and familiar evidence of conventional mental illness, Gould, 405 N.E.2d at 929-31, which is exactly what is lacking in this case. Further, Robidoux testified that he had witnessed Samuel's suffering-- indeed, that his wife toward the end could not bear to undress Samuel to bath him because his body was so emaciated. Any emphasis on Gould and on atrocity could easily have made matters worse by emphasizing the painful nature of Samuel's death to the jury.

One final argument cuts across the others: that his wife got a deferral of her own trial based on temporary incompetence and, after being "deprogrammed," ultimately was acquitted on a second-degree murder charge and convicted only of assault and battery. This, Robidoux argues on appeal, shows that his own counsel should have urged his incompetence and would through better

-20-

trial tactics have likely succeeded in warding off a murder conviction.

The information available is too meager for comparison, and we know almost nothing about Karen Robidoux's symptoms that triggered the incompetence finding or about the details of her defense at trial. It appears that she presented an argument akin to battered wife syndrome; Robidoux himself, occupying something of a leadership position in his sect (albeit behind his father), hardly seems a candidate for such an argument. Cult-brainwashing arguments rarely succeed. Cf. United States v. Hearst, 412 F. Supp. 863, 870 (N.D. Cal. 1975); United States v. Hearst, 563 F.2d 1331 (9th Cir. 1977), cert. denied, 435 U.S. 1000 (1978).

Finally, Robidoux's brief suggests that he is the only one to pay a heavy price for what was a collective activity; in addition to his wife's lesser conviction, the sister who reported the revelation was allowed to plead to being an accessory before the fact of assault and battery on a child and his father was never charged. But Robidoux was arguably the authority figure within his own family, and he concealed the body in the wall of his sister's house. Anyway, discrepant outcomes among defendants are common.

One of the perils of being a defense lawyer is that a common resort, after a defeat in a criminal case and an unsuccessful appeal, is a charge that counsel was not competent. This risk, like medical malpractice, comes with the territory.

-21-

But, having considered the very able briefing and argument by Robidoux's present counsel, we agree that his trial counsel was not deficient and that no available alternative strategy created a reasonable probability of success.

Affirmed.