Macdonald, D. Lloyd, J.
Before the Court is the motion of the Commonwealth to determine whether the defendant Ryan Jones (the “Defendant” or “Jones”) is competent to stand trial. He is accused of the first-degree murder of Valerie Oransky in Dartmouth on July 22, 2006. The Defendant was committed to the Bridgewater State Hospital (“Bridgewater”) for a competency evaluation pursuant to G.L.c. 123, § 15(b).
The Court held a hearing over two days. The Commonwealth called Sara Beszterczy, Ph.D. (“Dr. Beszterczy”), a licensed forensic psychologist on the Bridgewater staff. It was she who conducted the statutory evaluation. The Court also heard testimony from four lay witnesses called by the Commonwealth, Frank Gracie, IV, Paulo Leal, Shirley Monte and Tammy Araujo. Gracie, Leal and Araujo worked with the Defendant at the Country Kitchen Buffet, a restaurant in Dartmouth. (The victim was the manager of the restaurant, and the homicide occurred there. The Defendant was a dishwasher.) Monte was the Defendant’s “job coach” during the time of his employment. (Her immediate employer was Work, Inc., which had a contract with the Massachusetts Rehabilitation Commission, to provide such services to developmentally impaired individuals like the Defendant.)
The Defendant called Ronald Ebert, Ph.D. (“Dr. Ebert”), who had examined the defendant in connection with the two earlier competency hearings (December 2007 and March 2009), as well as in anticipation of the present one. Dr. Ebert has a distinguished career as a forensic psychologist. He began working with the Department of Mental Health in 1970; he was on the Bridgewater staff for many years, and he currently heads the forensic psychology program at McLean Hospital. He has testified frequently as an expert witness in District and Superior Court and the U.S. District Court. Dr. Ebert has testified before the Court in other cases and is highly regarded by the Court for his professional expertise.
On the basis of the evidence introduced at the hearing, the reasonable inferences drawn therefrom and arguments of counsel, the Court concludes by a preponderance of the evidence that the Defendant is competent to stand trial for the reasons that follow.
Prior Proceedings
This is the third competency hearing since the defendant was indicted. On December 5, 2007 following an order for examination pursuant to G.L.c. 123, § 15(a), Judge McLaughlin of this Court found the defendant to be competent. The case thereafter was prepared for trial; however, on the eve of trial in January 2009, the Defendant filed a Suggestion of Lack of Competency to Stand Trial and Motion for Examination. After hearing, this Court allowed the motion and ordered the Defendant to be examined at Bridgewater pursuant to G.L.c. 123, § 15(b). Thereafter a hearing was held, and Judge Moses of this Court determined the Defendant to be not competent. Order of March 27, 2009. Because the judge further concluded that the Defendant was not “mentally ill” as statutorily defined, so as to be eligible for commitment to the Department of Mental Health pursuant to G.L.c. 123, §§8 and 16, the Defendant was remanded to the custody of the Bristol County Sheriff. The Defendant has been held at the Dartmouth House of Correction since. In October 2009 the Commonwealth moved for a further G.L.c. 123, §15(b) competency determination, and the hearing before this Court ensued after receipt of the statutoiy report.
Standards
“The test to be applied in determining the competence of the defendant is ‘whether he has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him’ ” Commonwealth v. Valles, 360 Mass. 522, 524 (1971), quoting Dusky v. United States, 362 U.S. 402 (1960). The test is one of the defendant’s “functional abilities” to understand and to consult. Commonwealth v. Compononio, 445 Mass. 39, 48 (2005). “(T]he burden is on the Commonwealth to establish, by a preponderance of the evidence, that a defendant is competent.” Seng v. Commonwealth, 445 Mass. 536, 540 (2005). The defendant’s right in this regard is of constitutional dimension. Commonwealth v. Hatch, 438 Mass. 618, 619 (2003). See also Pate v. Robinson, 383 U.S. 375, 385 (1966), and Jackson v. Indiana, 406 U.S. 715, 723-35 (1972). “(T]he Commonwealth must affirmatively establish the defendant’s competency to stand trial.” Seng, 445 Mass. at 541.
*568 The determination as to competency is for the Court to make. Commonwealth v. Brown, 449 Mass. 747, 759 (2007). Among the relevant considerations are “the judge’s observations of the defendant’s demeanor and behavior . .., reports of psychiatric examinations of the defendant, statements to the judge about the defendant’s conduct and mental condition and the testimony of expert witnesses . . .” Commonwealth v. Hill, 375 Mass. 50, 54-55 (1978). At the competency hearing the judge is “not obliged to accept the testimony of . . . experts.” Commonwealth v. Brown, 449 Mass. 747, 761 (2007); see also Commonwealth v. Hung Tan Vo, 427 Mass. 464, 469 (1998).
Discussion
The Court is faced with a veiy difficult decision in this case, for there is no doubt that the Defendant, who is 31 years old and at the time of the crime was 28, has a substantial and persistent cognitive impairment. The experts agree (and the Court accepts) that Jones presents with a diagnosis of Pervasive Personality Disorder (“PPD”). PPD is a diagnostic classification which includes autism and Asperger’s Syndrome as subsets, according to Dr. Beszterczy. It was described by Dr. Beszterczy in her testimony as a “severe and pervasive impairment, developmentally and currently, in areas of reciprocal social interaction, communication, and behavioral flexibility.”[1] Jones as an infant was afflicted with spinal meningitis, which was apparently the origin of his PPD condition. In addition, the meningitis appears to have caused Jones to have a seizure disorder for which he has taken medication for many years and because of which he is SSI eligible. PPD is organic in nature and is essentially immutable.
From childhood, Jones was behavior challenged. He periodically acted out in unpredictable outbursts, he was socially isolated and had very limited peer interaction. He was in special education programs through high school. However, he had the benefit of parental support, and appropriate care has been sought for him throughout his life. Except for one arrest for a minor offense, Jones had no criminal record prior to the underlying incident.
As noted, the indicted offense occurred in July 2006 at the County Kitchen Buffet. Jones had been working there as a dishwasher for over three years. As will be referenced in greater detail below, Jones was a dependable and diligent employee, who, with one exception, had no difficulty with his fellow employees. The exception was with his manager, the victim, Valerie Oransky. However, his problems with her appear to have been limited to the single issue of his practice to ignore her instructions not to place pots and pans in the mechanical dishwashing system that was to be used only for plates, glasses and flatwear. Nevertheless, as suggested by the three-year period of his employment, Jones’s failure to restrict use of the dishwashing machine to plates, etc. was not deemed particularly serious.
There were no eyewitnesses to Oransky’s death (she was beaten and stabbed). It was Jones who alerted others to Oransky being in distress. When questioned, he denied any involvement and gave an exculpatory account to the responding police officers.
The specific reasons that lead the Court to conclude that the Defendant is competent to stand trial are:
1. The core inquiry in a competency determination is the capacity of the person to understand the nature of the proceedings against him and to be able to communicate with his counsel with regard to the substance of his defense.
2. Jones has consistently tested in the “low-normal” IQ range. He is not retarded. While IQ is not dispositive, it addresses at least one important dimension of the competency issue. As noted, he graduated from high school, albeit in special education structured programs.
3. The testimony of his co-workers and job coach confirmed the “normal” profile suggested by Jones’s IQ. As noted, he worked for over three years in a restaurant and remained in good standing until the day of the incident. It appears that the services of his job coach were rarely needed.
4. His co-worker in the kitchen, Frank Gracie, described Jones as not much different from other employees. While he found that in talking to Jones, Jones was “slow to register,” they conversed regularly about sports, family and “whatever” on a daily basis. Gracie characterized Jones as friendly and “not unintelligent.” He described that Jones daily assembled and disassembled the dishwashing machine (apparently, a somewhat complicated task). Gracie also described the evasive measures Jones would take to avoid the manager (Oransky) seeing him place pots and pans in the machine.
5. Paulo Real was the Defendant’s immediate supervisor for the last eighteen months of his employment. He testified that the defendant did more than just run the dishwashing machine and clean pots and pans. He had to “multi-task,” including bussing, stocking, trash disposal and stacking glasses, plates and flatware in their appropriate places. “Not everyone can do [the job],” Real testified. As to relations with other employees, he said that Jones had “normal interaction as any person would have at work.” In response to the Court’s specific question as to how Jones compared with the numerous other employees at the restaurant, Real stated that there was nothing unusual about him. Real concluded that Jones’s job coach was not needed.
6. Tammy Araujo, a third co-worker, testified that Jones “was the best dishwasher to this day.” She described him as consistently pleasant. She said that one did not need to explain things to him more than once and that she “had no idea that he had mental problems.”
*569 7. One quirkish (but insightful) custom of the Defendant described by his co-employees was that once a week on his day off, he would, nevertheless, show up dressed for work. The practice apparently coincided with his payday, and when he got his wages, he would then spend the day, instead, at the nearby mall going to the movies. Jones informed his coworkers, though, that his parents, one of whom dropped him off and picked him up at the end of the day, believed that he was actually working.
8. The observations of the Defendant’s co-workers are particularly significant because the examining psychologists all agreed that Jones’s cognitive/mental profile has not changed to this date from the time of Oransky’s death. Apparently, one of the distinguishing features of PPD, or at least the PPD variant that Jones displays, is its unchanging nature. The Court specifically inquired of Dr. Ebert at to whether there was evidence of “decompensation” or other material change in the Defendant’s clinical presentation at any time since his arrest, and Dr. Ebert responded that there had not been.
9. Notwithstanding the co-workers’ evidence, Dr. Ebert was unmoved from his opinion that Jones is not competent because he “has neurological deficits that prevent him from defending himself.” Dr. Ebert testified that the Defendant’s condition is “easy to miss” for those who are not professionals. One with the Defendant’s disabling variant of PPD can be charming and pleasant and “not say crazy things,” according to Dr. Ebert.
10. As noted, the focus of the competency determination is knowledge of the nature of the proceedings and the capacity to communicate with counsel. The Court was troubled by and attaches significance to the circumstance that the Defendant in his interviews with Dr. Beszterczy displayed little functional understanding of what he was charged with and the roles of the judge, the prosecutor and defense counsel and of the nature of a trial. This contrasted sharply with what Dr. Beszterczy noted was Jones’s presentation to Dr. Towers in early 2009. (It contrasted, as well, with his responses to the c. 123, §15(a) examiner in 2007 whose testimony Judge McLaughlin relied on in concluding that Jones “has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and ... has a rational, as well as factual, understanding of the proceedings against him.”)
11. In his early 2009 interviews with Dr. Towers, Jones was able to describe the essence of murder (“something like to plan [the killing] ahead of time”— Towers Report, Exhibit 1 at p. 17). As to the defense attorney, Jones said, “He’s working on my side; he’s on my side and he’s doing the best he can for me.” Id. As to the prosecutor, he said the prosecutor “may try to prove he committed First Degree Murder.” Id. Dr. Towers’s report continued: “With regard to his understanding of possible verdicts, Mr. Jones reported knowing that if found ‘guilty’ of a criminal offense, he will be ‘sentenced.’ He also said he believes that if found ‘not guilty by reason of insanity,’ he will be ‘sent to a hospital.’ If found ‘not guilty,’ he said, he will get to go home.” Id. Jones defined a witness as “a person who saw what happened” and a jury as “a group of people who decide whether [he is] guilty or not.” Id. at 18.
12. To Dr. Beszterzey’s inquiries on the same subjects less than a year later, Jones “seemed quite perplexed,” according to her testimony before the Court. She testified that Jones was unable to define murder, he claimed no understanding of what defense counsel is to do, the role of the jury, the role of witnesses and the function of the judge. From her understanding of the enduring but stable attributes of Jones’s PPD diagnosis, Dr. Beszterzey was suspicious that the Defendant was malingering by feigning a lack of understanding. She also noted that there was nothing in Jones’s clinical history that would explain this apparent deterioration. In response, Dr. Beszterzey administered a test (a “tool”) developed at Bridgewater to detect and measure the presence of malingering. The results of the test were “equivocal,” according to Dr. Beszterzey, but she opined that in her judgment the Defendant was attempting to present himself as having less understanding of his case and of the legal process than he in fact had. She also noted that while Jones described hearing “voices,” his description was clinically inconsistent with auditory hallucinations of psychotics. Dr. Beszterzey concluded her report in these terms: “Mr. Jones’ current presentation significantly interfered with my capacity to fully assess his rational understandings of various relevant processes, personnel, and decisions in regards to addressing his criminal matter and raised questions regarding his level of motivation to perform optimally. I am therefore unable to offer to the Court a definitive opinion [as to his competency].” Dr. Beszterzey Report, Exhibit 2 at p. 33.[2]
13. There was much in common in the clinical evaluations of Dr. Beszterzey, Dr. Towers and Dr. Ebert. Dr. Ebert noted, as Dr. Beszterzey had, the contrast between the Defendant’s responses to Dr. Towers (and to himself[3]) as to his understanding of the role of trial participants and the purpose of a trial and his responses to Dr. Beszterzey on the same subjects. Indeed, Dr. Ebert chose to interview the Defendant after Dr. Beszterzey’s testimony to get an explanation. Exhibit 5. In his testimony before the Court Dr. Ebert described that the Defendant responded at the time of the February 10, 2010interview that he had a “bad memory.” Dr. Ebert challenged the Defendant, stating to him that that was not true. Dr. Ebert testified that if he “push[ed] and prod[ded]” the Defendant, he could, nevertheless, eventually “get answers.”
*570 14. As the Court understands it, the essence of Dr. Ebert’s opinion is that, as with many persons diagnosed with PPD, there is a disconnect between the Defendant’s superficial intellectual/cognitive ability and his capacity to process and responsively communicate (in this instance) trial-relevant information. Most problematic, according to Dr. Ebert, is the narrowness of Jones’s comprehension and rigidity of his responsive repertoire.[4] He described that Jones, as many autistic individuals, gets “locked into an idea” and cannot “budge” from it. Dr. Ebert discounted the significance of the Defendant’s former co-workers’ testimony, not only for the reason previously noted (they are not professionals), but also because the Defendant’s PPD condition made him “the perfect dishwasher” on account of the fact that the tasks were concrete, could be learned by repetition and never changed. What the Defendant is incapable of is making “reasoned independent decisions” and because of that (in combination with his clinical profile) Dr. Ebert concluded that Jones is not competent.[5]
15. To state the obvious, there is a compelling public interest that one accused of being responsible for crime be tried. That interest could not be more compelling than where the crime at issue is first-degree murder. Of equal significance from the state and federal due process perspective is that only one who can understand the nature of a trial and be capable of cooperating with his counsel may lawfully be tried. Before the Court is a man with substantial cognitive and behavioral impairments of an organic source. But Drs. Beszterzey and Towers each were of the opinion that with time and effort it was likely that a person presenting the Defendant’s PPD profile would be capable of developing an understanding of the basic elements of the trial process and to be able reasonably to cooperate with counsel. And Dr. Ebert noted in his February 3rd letter to defense counsel, Exhibit 5, that notwithstanding the Defendant’s reluctance to respond, “I was able to get responses from him when I persisted with my questioning.”
16. The Court concludes that the Defendant presently has that understanding and capacity. In light of the totality of the factual and clinical record, Jones’s recent presentation to Dr. Beszterzey was an act of malingering. The Defendant has shown himself to be capable of rational calculation in his work and personal life, including instances of deception where something was to be gained. Against the additional backdrop of a satisfactory three-year job history, where he impressed his co-workers by his diligence and essential normality, the Defendant’s intentionally feigned presentation to Dr. Beszterzey strongly suggests that he has the cognitive and emotional wherewithal to understand, in fact, the nature of the proceedings and to assist his counsel. There is no reason to think that just as Dr. Ebert was able to obtain satisfactory responses from the Defendant with “persistence,” his counsel and others on his side as the case is prepared for trial could not do so, as well. The trial judge (and the judges who may become involved in pretrial proceedings) will reasonably accommodate the Defendant’s good faith needs on account of his undoubted impairments. But the Commonweath has convincingly proved by a preponderance of the evidence that the defendant Ryan Jones is competent to stand trial.
ORDER
The Court finds and rules that the defendant is competent to stand trial. The case is reassigned to the trial list, and the clerk of the First Session shall schedule a date for the assignment of a trial date and consideration of any other pending pretrial matters.

Dr. Ebert descrtbed PPD as a “variation of autism. Autistic disorders typically entail deficits in three main areas: communication skills, 2) socialization skills, and 3) restricted interests/repetitive behaviors.” Dr. Ebert Report, Exhibit 4 at p. 13.

Dr. Towers’s concluding opinion had also been equivocal: “Overall, then, it is my clinical opinion that Mr. Jones presents with many abilities and understandings typically considered by the courts in assessing competence to stand trial. At the same time, however, his understanding of courtroom proceedings appears to be only superficial, and it is unclear if he truly understands that things will not necessarily turn out the way he wishes if he simply explains certain information to the judge. Further, he appears to have some difficulty when it comes to making decisions about his case in an autonomous manner (i.e., without automatically deferring to his attorney). These deficits, in my clinical opinion, are not due to symptoms of mental illness but are likely the result, instead, of his somewhat limited cognitive functioning and his poor reciprocal social interaction skills. Should the Court find Mr. Jones competent to stand trial despite these limitations, Mr. Jones would likely benefit from having additional time to consult with his attorney through the course of the courtroom proceedings, as he tends to need to have information explained to him multiple times and in simple, concrete language.”

In his report in the section titled, “Understanding the trial process,” Dr. Ebert stated: “Mr. Jones reported that the role of the judge is ‘to rule in favor of our side or the prosecutor.’ He stated that the role of the prosecutor is ‘to try and find me guilty,’ whereas the role of his attorney is ‘to defend me.’ Mr. Jones stated that the role of the jury is ‘to decide what they’re going to do to me. Sentence or let me go.’ ” Dr. Ebert Report, Exhibit 4 at p. 11.

In his report, Dr. Ebert wrote: “While [Jones] displays adequate factual knowledge concerning the trial process and its participants, he does not show adequate rational ability to apply this information to his particular case or to adequately assist his lawyer in his defense. His overall understanding of his situation is childlike and limited, leading him to believe that an apology and a promise to ‘do better’ will suffice.” Id. at p. 15.

Of note to the Court, Dr. Ebert, however, found that Jones “continuéis] to exaggerate symptoms" (Dr. Ebert Letter of February 3, 2010, Exhibit 5), and he further found, as had Dr. Beszterzey, that Jones’s claims of hearing voices were clinically “atypical” and his statements in that regard suggested exaggeration and malingering. Nevertheless, Dr. Ebert ultimately concluded that Jones “is not malingering or falsifying his symptoms.” Id.