COMMONWEALTH *vs.* A.B.

No. 06-P-1383.

Bristol. January 4, 2008. - June 9, 2008.

Present: BERRY, KAFKER, & MILLS, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,*
Competency to stand trial, Assistance of counsel.

A criminal defense attorney's failure to present evidence of the defendant's
incompetency to the judge and seek a hearing in order to present a reason-
ably complete history upon which the judge could base a decision as to the
defendant's competency to stand trial constituted ineffective representation,
and regardless of the attorney's inaction, a new trial was warranted, based
on the defendant's history of mental illness and other facts that were
presented to the judge in support of the defendant's motion for a new trial.
[14-17]

INDICTMENTS found and returned in the Superior Court Depart-
ment on April 12, 2002.

The case was tried before *Richard J. Chin*, J., and a motion
for a new trial, filed on November 27, 2006, was heard by him.

*Cathleen E. Campbell* for the defendant.

*Shoshana E. Stern*, Assistant District Attorney, for the Com-
monwealth.

MILLS, J. The defendant was convicted by a jury of assault and
battery by means of a dangerous weapon, G. L. c. 265, § 15A.
He appeals from his conviction, claiming that it was error to fail
to hold a competency hearing before his trial began. He also ap-
peals from the denial of his motion for a new trial, claiming that
his counsel was constitutionally ineffective as to both a potential
insanity defense and the defendant's competency to stand trial.
We conclude that a new trial is required for the reasons set forth
below.

1. *Background facts.* We recite the facts the jury could have

found, reserving further details for discussion of specific issues raised. On the afternoon of January 26, 2002, Maria Albassan was with her friend Janell Correia, in a bar in New Bedford. They saw the defendant, who made some remarks mainly directed toward Correia. Albassan saw the defendant drink some beer, and she then left the bar for an errand. Correia stayed inside while the defendant followed Albassan outside, where an argument escalated to physical altercation. The defendant punched Albassan in the face, and Albassan struck the defendant in return.

Later that evening, Albassan, Correia, and Louis Fernandes went to another bar. When Albassan and Correia exited, the defendant was outside and started following Albassan. She kept turning in different ways so that the defendant would not know where she lived, and when she arrived at home she left a message with the bar to please tell Fernandes to wait for her outside because she and Correia were planning to return.

They did return and went inside. The defendant was on the other side of the bar, and Fernandes was playing pool. The defendant tapped Albassan on the shoulder and yelled at her, "You're mine, you're mine," whereupon Albassan yelled back, "No, I'm not. I'm not yours." Then, as Fernandes walked by a pool table, the defendant hit him on the back, saying, "You, I kill you. I cut you, you piece of shit."

At around 11:30 P.M., Fernandes left the bar to go home. As he started walking to his car, the defendant, who was standing in the doorway of the bar next door, came at him with a knife and said something like, "I kill you." The defendant started swinging at Fernandes with the knife, and Fernandes put his hands up to defend himself. His thumb was cut, and the defendant struck Fernandes on the head. The defendant's leg was caught, and he fell down. Throughout this time the defendant continued to swing at Fernandes, cutting his face and nose.

A crowd of people assembled and began hitting the defendant, and "banging him trying to get the knife off him." Police Officers Paul Patota and Terrance O'Shea arrived and, after securing the knife, received a description of the assailant from Fernandes, which was broadcast over the police radio. Based on the description, Officer Kevin LaPalme, one of the officers

called to the scene, observed the defendant staggering on a side-walk, bleeding from his head. The defendant was taken to the hospital for treatment.[1] There, both Albassan and Correia identi-fied him as the man who had attacked Fernandes.

2. *The defendant's mental illnesses.* The motion for new trial was decided by the trial judge. Submissions by both parties with respect to the defendant's motion for new trial included, in addition to the motion judge's earlier decision on the defendant's motion to suppress (see note 1, *supra*), affidavits of three attor-neys (one of whom was trial counsel), and various mental health evaluations and summaries by personnel at both the Taunton and Bridgewater State Hospitals (TSH and BSH). Additional mental health evaluations had been filed (under seal) prior to the de-fendant's November 30, 2004, trial. These documents, the authen-ticity of which is not at issue, included recitations of the defendant's family history, the extent of his psychiatric hospitalizations, vari-ous diagnoses of his mental illnesses, and medications prescribed (as well as administered to him) while he was hospitalized at var-ious times over the course of the ten years prior to his trial.

---

[1] With his motion for new trial, the defendant submitted the memorandum and order on his motion to suppress, decided four months before the trial, in which the motion judge (who was not the trial judge) recited:

> "It is undisputed that the defendant, at the time of his admission to St. Luke's Hospital Emergency Room, was suffering with a head injury, was uncooperative, and verbally abusive to the hospital staff and to the police who accompanied him. Laboratory results of blood drawn after admission show that his blood alcohol level was elevated. The police officer with the defendant stated that the defendant was speaking and yelling in Portuguese; and the hospital medical record notes that the defendant was speaking Portuguese with some English."

In reaching her conclusion that the defendant's motion to suppress state-ments made by him at the hospital should be allowed, the judge explained:

> "An analysis of certain relevant factors such as the conduct of the defendant, 'loud, excited, and yelling'; his emotional stability, physical and mental condition, suffering from a head wound, and inebriated; and the details of the interrogation . . . combine to convince the court that the defendant did not validly waive his Miranda rights nor were his statements voluntarily made."

At the beginning of the hearing on the defendant's motion to suppress, his competency was discussed, but no determination of competency was made.

The submissions indicated, as the judge acknowledged, that the defendant had a significant history of mental illness dating back to 1993, and had been confined at BSH at least five times.[2] In 2003 and 2004, while being held awaiting trial, the defendant continued to suffer from very serious mental illnesses. He fired attorneys whom he believed to be conspiring against him,[3] and he was committed to BSH on September 25, 2003. From September, 2003, through March, 2004, he was determined incompetent to stand trial. In March of 2004, the same BSH psychologist who had determined the defendant incompetent opined that he "no longer demonstrates significant deficits in those abilities usually associated with competence to stand trial." In ruling on the motion for new trial, the judge construed this language as an opinion that the defendant was competent to stand trial. The psychologist surmised that the improvement in the defendant's mental health status was, most likely, a function of his compliance with his antipsychotic medical treatment.[4]

Subsequent to the March, 2004, evaluation, the defendant was not returned to jail to await trial, but instead was committed to TSH because he posed a threat and danger to others.[5] He remained there from March 12, 2004, throughout the course of the

[2]Bridgewater State Hospital is a medium security facility. Each person admitted to BSH is subject to a court-ordered evaluation under an applicable section of G. L. c. 123. Administrative records from BSH indicate that the defendant was first admitted on December 20, 1993. He was committed on February 17, 1994, for a period of six months. On September 7, 1994, he was recommitted for one year, which was extended for another year on September 20, 1995. It thus appears that his first BSH commitment lasted for nearly three years. Subsequent dates of his commitments at BSH are not clear from the record, but indicate four additional commitments to BSH prior to his trial.

[3]Attorney Carlos Britto, who represented the defendant in 2002 and 2003, reported in his affidavit his perception that the defendant was suffering from major mental health problems and stopped recognizing the attorney, began accusing the attorney of creating problems, and started acting aggressively, including threats. This attorney observed that to him the defendant displayed a "Dr. Jekyll/Mr. Hyde personality," and that the attorney never knew how the defendant would act — one day he would appear to be fine, and the next day would act aggressively, threatening the attorney or refusing to speak with him.

[4]There is no evidence that the defendant was medicated continuously between the time of the March, 2004, evaluation and the time of his trial.

[5]The record also indicates that the defendant was "sent on Section 12(e) for continued treatment of his illness due to risk of noncompliance with treatment and risk of harm to others if released into the community." The several rec-

pretrial proceedings, including the hearing on his motion to suppress, held in July, 2004, until November 30, 2004, the date of his jury trial. While at TSH he was diagnosed as suffering from continued paranoid schizophrenia and was found to have a long history of a psychotic disorder with a significant history of medication noncompliance resulting in "psychotic decompensations and violence . . . ." He was further noted to have "marked paranoid and persecutory delusions and a belief system regarding the American legal system, also delusional beliefs that people are following him, has [*sic*] a conspiracy against him." Further, while at TSH, it was noted that the defendant "has no insight or understanding about his illness or his legal charges secondary to his psychotic illness. He has been noncompliant with his medications out in the community, and per history he becomes assaultive when he decompensates." Additionally, in June of 2004, while at TSH, the defendant was diagnosed with mild mental retardation.

3. *Discussion.* The failure of the attorney to request a competency determination *by the judge*, reasonably contemporaneous with the trial, was ineffective representation, and the judge's conclusion to the contrary was error.[6] Further, regardless of the

ords of his confinement at BSH and TSH are based, generally, on G. L. c. 123, § 12, without more detailed specification. This imprecision is not helpful.

[6]In view of our disposition, we need not decide, but remain troubled by, the defendant's claim that his trial attorney gave constitutionally ineffective attention to a potential insanity defense. See *Commonwealth* v. *Roberio*, 428 Mass. 278, 279-280 (1998), quoting from *Commonwealth* v. *Doucette*, 391 Mass. 443, 458-459 (1984) ("[f]ailure to investigate an insanity defense [falls] below the level of competence demanded of attorneys, if facts known to, or accessible to, trial counsel raised a reasonable doubt as to the defendant's mental condition"). The trial attorney (the defendant's third assigned counsel) reported in an affidavit (which was credited by the judge) that the defendant, prior to trial, when asked if he wished to raise an insanity defense, responded that he did not. The judge, in ruling on the new trial motion, concluded that the attorney "cannot be faulted for abiding by his client's *clear* wishes not to proceed with [the *McHoul*] defense" and that the attorney "properly followed [the defendant's] directive by not pursuing the defense." See *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

In the circumstances of this case, as in *Commonwealth* v. *Milton*, 49 Mass. App. Ct. 552 (2000), where the defendant's competency was in question, and where a *McHoul* defense was the only viable defense, as identification of the defendant was essentially conceded, more analysis appears to be required by both counsel and the trial judge. Compare *Commonwealth* v. *Companonio*,

attorney's inaction, the trial of the defendant without a timely competency determination was error warranting a new trial.

"It is axiomatic that the trial, conviction, or sentencing of a legally incompetent person violates that person's constitutional right to due process." *Commonwealth* v. *Simpson*, 428 Mass. 646, 649 (1999). It is the Commonwealth's burden to "prove the defendant's competence at the time of trial by a preponderance of the evidence." *Id.* at 654. The question of a defendant's competency at the time of trial may be presented in a motion for new trial. See *ibid.* "If the defendant was incompetent at the time of his trial, it was a miscarriage of justice to convict him, even if there was overwhelming evidence that he had committed the crimes charged." *Id.* at 649.

In his decision denying the defendant's motion for new trial, the judge recognized that "[a] competency evaluation made contemporaneously with trial would have been preferable" (quoting from *Commonwealth* v. *Companonio*, 445 Mass. 39, 50 [2005]), but ruled that "it was not error warranting a new trial for [the defendant]'s competency not to be reexamined[7] prior to trial."

The defendant's trial counsel never asked for a competency hearing, but states in his affidavit submitted with the new trial motion: "On the day of [the defendant's] jury trial, a hearing was not held by the trial judge to inquire about [the defendant's] competency. . . . I believe that [the defendant] may have an appealable issue regarding his competency. . . . [He] has a history of mental disorders. For example, a staff member at [TSH] indicated to me that a relative of [the defendant] had told him that [the defendant] had felt, at some point in the past, that his television was speaking to him. . . . In all of my conversations with [the defendant], his responses to me have been extremely minimal."

Additional psychological evaluations of the defendant were made at TSH on May 25, June 1, and June 15, 2004, after the March, 2004, report relied upon in the decision on the defend-

---

445 Mass. 39, 51 (2005) (where defendant competent to stand trial, counsel not ineffective in forgoing diminished capacity defense pursuant to defendant's decision, made against the advice of counsel).

[7]While the judge used the word "reexamined," there is no evidence that an in-court determination of the defendant's competency ever took place.

ant's motion for new trial. The report of those evaluations, written in June, 2004, indicates that the defendant "has had marked paranoid and persecutory delusions and delusional beliefs . . . [and] a history of alcoholism, psychosis, and a possible history of head injury." The reporter's summary and conclusions commented, "During . . . interview[s] [the defendant] appeared to display very limited insight into the nature of his difficulties. . . . Overall, the testing was suggestive of serious intellectual impairment and generally serious neuropsychological impairment. . . . [The defendant] is seriously intellectually and neuropsychologically impaired [and also] would qualify for a . . . diagnosis of . . . [m]ild [m]ental [r]etardation."

The defendant's TSH discharge summary, dated November 30, 2004 (the date of his Superior Court trial), noted a "significant history of medication noncompliance with associated psychotic decompensations and violence and . . . marked paranoid and persecutory delusions . . . ." The summary also concluded with the observation that the defendant "is considered a danger *due to his psychiatric illness* . . . , and is assaultive when he decompensates" (emphasis added).

According to the docket in this case, even though a March, 2004, BSH report has been relied upon as evidencing an opinion of the defendant's competency, no hearing was conducted to evaluate the soundness of the report or the defendant's competency to stand trial eight months later, in November, 2004.

> "The inquiry [by the appellate court] 'is not why counsel failed to request a competency hearing or why the court failed to hold one on its own initiative, but whether, no less on hindsight than by foresight, there were elements of such indication in the situation as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [the defendant's] competency to stand trial.' "

*Commonwealth* v. *Companonio*, 445 Mass. at 48, quoting from *Commonwealth* v. *Hill*, 375 Mass. 50, 54 (1978), quoting from *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967).

The defendant's history of mental illness, including a previous determination of incompetency, the reports of his behavior

while medicated as compared to his periods of noncompliance with medical treatment, and other facts that were presented to the judge in support of the motion for new trial, present a substantial question of possible doubt as to the competency of the defendant to stand trial. Accordingly, a new trial should have been ordered. Trial counsel was ineffective for failing to present the evidence of incompetency to the judge and failing to seek a competency hearing in order to present a reasonably complete history upon which the judge could base a decision as to the defendant's competency to stand trial on November 30, 2004. The judge's ruling to the contrary was error.

*Judgment reversed.*

*Verdict set aside.*

*Order denying motion for new trial reversed.*