Commonwealth *vs.* Nancy Adkinson.

No. 10-P-432.

Middlesex. May 5, 2011. - October 5, 2011.

Present: Cypher, Brown, & Hanlon, JJ.

*Due Process of Law,* Competency to stand trial. *Battered Woman Syndrome. Practice, Criminal,* New trial, Defendant's competency.

A Superior Court judge erred in denying the criminal defendant's motion for a new trial, where a substantial question existed regarding the defendant's competency to consult rationally with her lawyer in order to assist in her defense, and therefore her competency to stand trial, given the undisputed evidence of serious, violent, long-term physical and emotional abuse; substantial evidence that the defendant suffered from battered woman syndrome; and compelling evidence of the abuser's ongoing control, to the defendant's detriment. [583-591]

Indictments found and returned in the Superior Court Department on February 14 and July 25, 1996.

A motion for a new trial, filed on March 7, 2002, was heard by *Thomas E. Connolly,* J.

*Robert S. Sinsheimer* for the defendant.

*Kevin J. Curtin,* Assistant District Attorney, for the Commonwealth.

Hanlon, J. Along with her husband, the defendant was convicted of sexual abuse of her four minor sons and related drug offenses after a joint jury-waived trial in 1997.[1] In 2002, she filed a motion for a new trial, arguing that battered woman syndrome had rendered her incompetent to stand trial, and thus

---

[1]The defendant appealed, but eventually sought and obtained a dismissal of her direct appeal. The direct appeal of her codefendant, Corby Adkinson (Corby), was transferred to the Supreme Judicial Court, on the court's own motion, and his convictions were affirmed in 2004. *Commonwealth* v. *Adkinson,* 442 Mass. 410 (2004). He later died in prison.

she suffered a violation of her constitutional right to due process.[2] A judge other than the trial judge was assigned to hear the motion for a new trial.[3] After reviewing the motion and supporting materials and conducting a three-day evidentiary hearing, the motion judge denied the motion.[4] We reverse.

*Facts.* The facts found by the motion judge are substantially supported by the information and materials that were before him at the hearing; we supplement with uncontested material facts from the record in order to provide context. See, e.g., *Commonwealth* v. *Robinson*, 449 Mass. 1, 5 (2007). The motion judge found that the defendant "experienced physical and emotional abuse from [her husband, Corby Adkinson,] throughout their lives together in Lowell. Corby . . . would beat or threaten to beat [the defendant] on a periodic basis causing her black eyes, bloody lips and other injuries. After nearly every one of his beatings, he would apologize and promise that he would never do that again. He would tell her how much he loved her, only to repeat later the same cycle of violence. Corby . . . was a 'control freak,' who wanted to know where [the defendant] was and who she was with at all times."[5]

The charged crimes involving the defendant's sons, aged

---

[2]See *Bishop* v. *United States*, 350 U.S. 961 (1956); *Commonwealth* v. *Simpson*, 428 Mass. 646, 649 (1999).

[3]The trial judge had retired by the time the defendant moved for a new trial.

[4]The submissions by the defendant with respect to the motion for a new trial included affidavits from both the defendant's first and second trial attorneys, Douglas A. Parigian and Albert Bielitz, respectively, as well as affidavits and reports from clinicians from other, prior proceedings. The Commonwealth presented no expert testimony and called no witnesses.

[5]In addition, Carol Ball, Ph.D., one of the defendant's expert witnesses, evaluated the defendant in 1998 and testified at the hearing. Her report indicates that the defendant was born to a single mother, the product of a rape by a man her mother was dating. She was placed in a State facility and then in a foster home before her mother regained custody of her when she was three years old. At that time, her mother was married to a man who abused her mother in the defendant's presence; by the time the defendant was sixteen, she had had two additional stepfathers, one of whom was also abusive to her mother.

The defendant first met Corby in California in 1982, when she was about twenty years old. At that time, she was divorced from her first husband, Kenny Bock, and living with their young daughter, Nicole. Early in the defendant's relationship with Corby, she tried to end it, telling him to leave her alone. In response, Corby warned her that she would pay for rejecting him. Shortly afterwards, the defendant's house caught fire; she was unable to

approximately eight to eleven, occurred between May, 1995, and November 23, 1995. *Commonwealth* v. *Adkinson*, 442 Mass. 410, 411 (2004). During that time, Corby sexually abused and raped each boy repeatedly and, according to the defendant, forced her participation as well. The defendant's affidavit states, "He threatened to hurt me unless I participated in this sexual abuse. He constantly carried a large knife (the knife which was introduced into evidence by the prosecution at my trial), and he often used it to threaten and intimidate me."[6] At some point in

rescue her three year old daughter, who died in the flames. Authorities believed the fire had been intentionally set, but never charged anyone with the crime. The defendant suspected that Corby might have set the fire because she had rejected him.

Nevertheless, after the fire, the defendant, who was severely depressed, began to rely on Corby for support; eventually, they began living together. They moved to Florida, and in 1984 they moved to Lowell. Their first son was born in May, 1984, and they married in September, 1984. They subsequently had three other sons. The defendant reported to Dr. Ball that Corby was physically, sexually, and verbally abusive throughout the marriage. Among other things, he raped and sodomized her when she was pregnant, injected her with drugs, and prevented her from leaving the house unless he was with her or in a position to monitor her.

[6]The defendant's youngest son, now twenty years old, testified at the hearing on the motion for a new trial. Overall, he described a situation in which his father exercised almost complete control over his mother. "If my mom wanted to do something, it had to go through my father. Sometimes he'd give her an hour, maybe two, to go pick up groceries, get food . . . ." He described instances of horrific abuse, including one occasion when his mother tried to escape the house in the middle of the night. His father put him and his brothers in the car and went looking for her. When he found her, he pushed her into the car and, once home, began to beat her in the parents' bedroom. "The door burst open and I saw my mom kind of stumble back . . . and she had like green and mixed with blood coming from her nose. She was a mess. She couldn't open her left eye or one of the eyes. . . . And he steps on her feet. I'll never forget it, and looked right at his foot and just laid into her face with his fist. And she fell back and he grabbed her, threw her up against the washer." On another occasion, the defendant tried to intervene on her son's behalf after his father had hit him with a baseball bat. "I walked in the door and I just got leveled. I mean right in the back. . . . [M]y mom stepped in and told him to — like what are you doing? I can't believe you did that and tr[ied] to go after him. And he turned around and smacked her with the bat." He did not testify in detail about the sexual abuse at the motion hearing; however, he related one incident in which his father was showing him and one of his brothers "things that he was doing to [their mother] . . . and one of the things had to do with jumper cables that he put on her nipples and was playing with her sexually." His mother was lying on the bed, naked and silently crying.

1995, Corby apparently convinced the defendant and the children that the defendant's ex-husband, Kenny Bock, was living under the floor boards in the attic and doing terrible things to them. He also convinced the defendant that Bock had been drugging the children. In fact, according to the defendant and her youngest son, Corby was using cocaine and administering it to her and to their children.

On November 23, 1995, Thanksgiving Day, one of the boys telephoned 911 and asked for help. The police responded; the children and the defendant were taken to Lowell General Hospital, where all four children tested positive for cocaine. The Department of Social Services[7] (DSS) took emergency custody of all four children.

Thereafter, between Thanksgiving and December 23, 1995, according to the defendant's affidavit and testimony at the motion hearing, Corby repeatedly instructed her on what she was to say to DSS with respect to the pending care and protection proceeding; when he thought that she disobeyed him, he beat her. On December 22, 1995, when Corby was rehearsing with the defendant what to say, he put a knife to her throat and threatened to kill her if she told anyone what had happened to their children. Afterwards, the defendant broke free and tried to escape, pushing a television out the window and then jumping through the window in a nightgown and bare feet. Eventually the police were called to the scene and the defendant was transported to a hospital. She told the hospital staff that Corby had put a knife to her throat, that he was molesting their children, and that he was drugging "us." Several hours later, on December 23, 1995, she was transferred to the Solomon Mental Health Center (Solomon) for a psychiatric evaluation.[8] There, she repeated the allegations of abuse that she and her children had endured.

Two days later, on Christmas Day, Corby's lawyer, Edward J. Moloney, Sr., went to Solomon and spoke to the defendant. He

---

[7] It has since been renamed the Department of Children and Families.

[8] The motion judge found that the defendant was not sent to Solomon until after her arraignment in Lowell Division of the District Court Department, on January 18, 1996, but the record, including specific testimony related to the records from the hospital, reflects that she was admitted on December 23, 1995, and discharged on December 29, 1995.

told her that if she continued to talk as she had done to the Lowell police and the staff at Solomon, she would never get custody of her children back from DSS. Corby also visited the defendant at Solomon. Thereafter, the defendant told the staff that Corby was a good husband and father. On December 29, 1995, she was released from Solomon and she returned to live with Corby.

The defendant and her husband were arrested by the Lowell police and charged with the offenses against their children on January 17, 1996. The defendant was interviewed separately; after waiving her Miranda rights, she signed a detailed, four-page, typed statement disclosing sexual and drug abuse in the Adkinson family with explicit examples. She also described Corby's extensive physical abuse of all the children and of her.

The next day, the defendant was transported to Lowell Division of the District Court Department, and Corby was among the other prisoners in the transport wagon. On the ride, he angrily warned her to "get [her] f-ing act together" and "get [her] story straight."[9] Attorney Douglas A. Parigian was assigned to represent the defendant at her arraignment on January 18, 1996. Corby was represented by Attorney Moloney. Thereafter, the defendant was held without bail at the Massachusetts Correctional Institution at Framingham (MCI Framingham), and Corby was held in the Cambridge jail.

The following day, January 19, 1996, Parigian met with his client at MCI Framingham, and spoke to her in detail. According to Parigian's affidavit, the defendant described "a long history of physical and emotional abuse which she had suffered from her husband." She told Parigian that "her husband limited the people she was allowed to speak with and did not allow her to have friends of her own." She also said "she felt threatened by her husband."

The motion judge credited Parigian's statement in his affidavit that, based on these discussions with his client and his review of her four-page statement given to the Lowell police, he "began to explore a possible defense to the charges based on duress supported by Battered Women's Syndrome — namely

---

[9]Another prisoner who was in the wagon with the defendant and Corby corroborated the defendant's account of this exchange.

that her criminal acts against her children had been forced upon her by her battering husband" and that he so informed the defendant at their January 19, 1996, meeting.

Although the motion judge did not make any specific findings regarding what occurred between January 18, 1996, the defendant's arraignment date, and February 22, 1996, when Parigian was replaced with another attorney, the following additional facts were adduced at the hearing and were not disputed. At some point on the District Court arraignment date, the defendant and Corby were lodged in adjacent holding cells. Parigian met with the defendant in the holding cell and began to discuss with her his recommendation that the cases be severed. Corby told Parigian that the cases would not be severed, and later that day, while they were still in the court house, he told the defendant to get a new lawyer.

Three days later, on January 21, 1996, Corby's mother, Margaret Adkinson (Margaret), and Corby's attorney, Moloney, visited the defendant at MCI Framingham.[10] Margaret told the defendant she could trust Moloney, and she provided MCI Framingham, with the necessary documents that would permit the couple to correspond, contact that was usually prohibited between prisoners. Margaret also instructed the defendant to place her, Margaret's, telephone number on the list of numbers that the defendant was permitted to call. The defendant was instructed by Margaret, and by Corby in his letters, to call Margaret daily. (Corby wrote, e.g., "I want you to call everyday," and, "[C]all mom everyday till sentencing").[11] In these conversations with the defendant, which continued until the trial date, Margaret relayed to the defendant what Corby wanted her to do. Corby sent letters almost daily to the defendant, repeating

---

[10] Attorney Parigian stated in his affidavit that he did not know at the time that Moloney had visited his client in jail. Moloney knew that Parigian was representing the defendant because, according to Parigian's affidavit, both attorneys had appeared on the same date at their respective clients' arraignments. Parigian stated that Moloney did not ask his permission to visit his client and that, if Moloney had asked permission, he would have refused him permission.

[11] Corby's demands that the defendant call his mother every day appear in letters dated in 1997; they were admitted in evidence at the hearing. On Corby's instruction, the defendant gave Corby's earlier letters (two plastic trash bags containing one hundred or more letters) to his mother. See note 32, *infra.*

or making additional demands of her regarding specific communications she should have with various lawyers and others.

On January 30, 1996, Moloney wrote a letter to the defendant stating that he could not represent both her and Corby "[b]ecause of a possible conflict of interest"; he directed her to contact her attorney, Parigian, if she had any further questions.[12] Corby immediately instructed the defendant to write to Moloney. Shortly thereafter, as the motion judge found, the defendant "wrote a one page letter dated February 3, 1996 to Mr. Moloney, indicating . . . that her four page statement to the Lowell Police is 'false,' 'is not my statement,' and that 'the Lowell Police lied to me.' " In that letter, the defendant also told Moloney she "would like [a] Unified Defense and Coed defendants [*sic*], so [the two] lawyers can work together and so Corby and I can be together to prepare our Defense."

About two weeks later, on February 13, 1996, Parigian again met with the defendant and discussed her desire to present a "unified defense" with her husband. According to the motion judge's findings, the unified defense was that the "sexual allegations were the result of suggestive interviewing on the part of DSS, and/or that [the defendant's] first husband, Kenny Boc[k], was responsible." See *Commonwealth* v. *Adkinson*, 442 Mass. at 412-413 (defendant and codefendant pursued a "unified defense"). The defendant even provided Parigian with a copy of the decision in *Perkins* v. *Wagner*, 513 F. Supp. 904 (E.D. Pa. 1981), a case involving a request for visitation rights so that a husband and wife could prepare a coordinated defense. Parigian advised the defendant against this approach and explained that the *Bruton* case[13] would likely prevent a joint trial and that her "own battered woman" defense was separate from any defense Corby might have. Within a day of this meeting, Corby orchestrated the retention of new counsel for the defendant. He contacted Attorney Albert Bielitz, arranged for him to represent the

---

[12]On the same date, Moloney sent a copy of the letter to Parigian and a copy of a motion he had filed seeking permission for Corby and the defendant to visit.

[13]See *Bruton* v. *United States*, 391 U.S. 123, 135-137 (1968) (severance is constitutionally compelled where an extrajudicial statement made by a nontestifying codefendant will be admitted and the statement implicates another defendant).

defendant in Superior Court, and arranged for payment of his fee.[14]

Thereafter, on February 22, 2006, Parigian, unaware that Corby had arranged a change in counsel, was present at the defendant's Superior Court arraignment, expecting to represent her. Bielitz was also present. According to the defendant, while she was waiting in the courtroom, Corby told her that he had hired Bielitz to represent her and that she should fire Parigian. Thereafter, the defendant was arraigned, and Bielitz entered an appearance on her behalf. The same day Corby wrote a letter to Bielitz stating, "We will definitely want to be tried together and we want court ordered visits as soon as possible which will include jail visits and holding cell visits before and after court. [The defendant], me, you, and Mr. Murphy must also get together at visit[s] to discuss this." This letter was admitted in evidence at the hearing.

After the arraignment, Bielitz had "at best three or four meetings" alone with the defendant. At Corby's request, Bielitz filed motions with the trial court renewing the request to permit written communications between the defendant and Corby and to arrange for her to be brought to the Cambridge jail for conferences with Corby, Bielitz, and Murphy to prepare a "unified defense." The requests were allowed.

As the motion judge found, however, Bielitz was also of the belief that the two cases should be severed and tried separately, rather than presenting a joint trial with a unified defense.[15] Yet,

---

[14]Specifically, the defendant testified that, when Corby learned that Parigian was urging her to sever her case from his, Corby told her to write to Albert Bielitz, an attorney whom Corby knew had entered a limited appearance on her behalf at her February 5 Superior Court bail reduction hearing, about a week before her meeting with Parigian on February 13. One day after the meeting with Parigian, the defendant wrote to Bielitz. In that letter, the defendant asked Bielitz to get in touch with Corby. Bielitz testified at the hearing on the motion for a new trial hearing that, when he received the defendant's letter, he visited Corby in jail as instructed. Corby asked him to represent both him and his wife, and assured him that there would be no conflict of interest because they wanted to pursue a unified defense. Corby then retained Bielitz on behalf of the defendant, and Bielitz brought in a second attorney, one George Murphy, to represent Corby. Corby paid both attorneys. Moloney arranged for payment of the legal fees after the Adkinsons' house was sold.

[15]Bielitz testified that "[f]rom the moment I got the case, I considered it to be a case for a plea on behalf of [the defendant]. I could not fathom going to

as Bielitz explained at the hearing on the motion for a new trial, "[E]very time I brought up anything other than [the defendant] and Corby going to trial together, Corby went crazy."

For example, after one meeting in which Corby became particularly upset and almost violent, he wrote to Bielitz immediately afterwards, questioning his advice.[16] On another occasion, when the parties were in court on September 19, 1996, for a motion related to obtaining expert funds, a similar event occurred. Bielitz was approached in the courthouse by the prosecutor who was handling the Commonwealth's case. The prosecutor suggested that the Commonwealth would consider recommending a sentence of credit for time served and straight probation on a guilty plea, in exchange for the defendant's testimony against her husband. Bielitz conveyed this offer to the defendant, while she was in lockup, and strongly urged her to consider it. When Corby was being taken out of the courthouse to be transported back to jail, having apparently either overheard or been informed about the offer, he began yelling at Bielitz, "there [are] to be no [plea] discussions." According to Bielitz, a court officer had to push Corby away from the lawyer and into the elevator that would bring him to the transportation area. The defendant then told Bielitz that she did not want to hear anything about a plea.

Within the next few days, Corby and the defendant instituted a rule that no lawyer in the case was to meet with his client separately and that all meetings required the attendance of Corby and the defendant and the two lawyers. See *Commonwealth* v. *Adkinson*, 442 Mass. at 412 (both counsel had been instructed by their clients that no client meeting was to take place unless

---

trial together." Bielitz stated that "virtually every single aspect of this unified defense harmed one party or the other."

[16] In that letter, dated June 11, 1996, Corby stated, "I am left with many reservations and doubts . . . that we are not on the same track and that we are not proceeding in a manner that I and [the defendant] had expected . . . ." Corby warned Bielitz that "[m]any things must change soon so that I and [the defendant] can proceed to gain our freedom as a unified defense and codefendants. This is a must for us." Corby continued, "I am writing to [Murphy] who [the defendant] and I consider to be the lead lawyer in our unified defense." Corby emphasized that "[the defendant] is not, nor am I interested in listening to any deals or plea bargains and we both are expecting to see each other soon and appear in court soon."

both clients were present). Bielitz and Murphy referred to this requirement as "Corby's rule." The motion judge found that the rule was written and signed by both Corby and the defendant and given to both lawyers.[17] The motion judge found that Bielitz was thus "prohibited from speaking privately with his client and never again met privately with her right through to the delivery of the guilty verdicts by the Court."[18]

Shortly before trial began, at the attorneys' request, Corby and the defendant each signed a statement to the effect that they had been advised on numerous occasions by their respective attorneys that "we should not be tried together. We have both decided we wish to present a unified defense and be tried together." Bielitz testified that during the trial Corby was in "[t]otal control," and the defendant just "sat there."

During the trial itself, on the ninth day, the judge apparently became concerned about whether the defense had considered severance.[19] Both defense lawyers affirmed that their respective clients wanted to proceed with a unified defense. Similar concerns were raised at the sentencing hearing. As the motion judge found, Bielitz sought permission from the defendant to be able to argue at sentencing how much she had been abused by her husband and constrained or coerced by him to commit the acts that formed the basis for the guilty verdicts. After a discussion at which Bielitz, Murphy, Corby, and the defendant were present, it was decided that Murphy would represent both Corby and the defendant at sentencing and that Bielitz would not address the

---

[17]Once, after the invocation of "Corby's rule," Bielitz went to MCI Framingham, to visit the defendant, but she would not come down and speak to him. The defendant testified that she did not speak to Bielitz without Corby being present because she was not "allowed to do anything else. I did what I was told to do."

[18]The defendant's lawyer for the care and protection case relating to her children's custody testified that Corby sent her a letter imposing a similar demand on her representation of the defendant in that matter.

[19]The trial judge stated, "There has been some evidence . . . , including the statement of your client, that there well could be a potential for antagonistic defense in this particular case, as far as your client is concerned. Even some of her children . . . [testified] that your client was forced in one way or another or compelled by Mr. Murphy's client, her husband, to do these particular acts." The judge asked Bielitz to address whether severance had been considered and Bielitz responded that "from the day we became involved in this matter, both Mr. and Mrs. Adkinson stated they wanted a unified defense."

judge at the defendant's sentencing hearing. The trial judge questioned the defendant regarding this decision, but eventually acceded to her request to be represented by her husband's lawyer. No mitigating factors related to the defendant's long history of abuse were presented, and the trial judge sentenced her to from thirty-five to forty years.

*Expert testimony.* In support of her motion for a new trial, the defendant presented the testimony of three experts, psychologists Robert H. Joss and Carol Ball and a licensed clinical social worker, Mary Jo Haggerty. Haggerty and Dr. Joss had both met with the defendant before the trial on the underlying criminal case, and Dr. Ball conducted an evaluation two years later, in 1998, in preparation for providing psychiatric evidence in the children's care and protection proceeding.[20]

Dr. Joss testified that he was a "designated forensic psychologist . . . and a forensic mental health supervisor to the Department of Mental Health."[21] He was initially asked to evaluate the defendant on the issue of her "suggestibility" with a view to arguing that her postarrest statement to the Lowell police should be suppressed.[22] At that time, he did not have a serious question about her competency. However, when informed of all of the circumstances of this case, including the procedural history, particularly the rule against private consultation with the lawyers, Dr. Joss came to the opinion that the defendant suffered from battered woman syndrome and that "it would have made her incompetent to make the decision to separate the trials." He further opined that, "given the way that her husband structured things," she would not have been able to "decide what was best

---

[20]Dr. Joss and Dr. Ball each obtained updated information in preparation for their testimony at the hearing on the motion for a new trial.

[21]Dr. Joss had conducted a private consulting practice since 1994; prior to that, he had been the court psychologist in the Lynn District Court for eleven years, and before that had worked in the Salem District Court. He had been qualified as an expert in forensic psychology on "literally hundreds of occasions, in just about every Superior Court from Worcester east and Federal District Court, Springfield . . . [and in] many of the District Courts . . . [,] Malden, Lynn, Gloucester, Salem, Peabody, Lawrence, Lowell, all the District Courts there."

[22]Dr. Joss testified, "It appeared to me that [the defendant] was significantly able to be pushed around interpersonally. The scores were in the ninety-fourth percentile."

for her in terms of the case and approach the case to find a solution to her own legal problem." He also explained that the psychological testing conducted by Dr. Ball confirmed his view, in that the testing showed "evidence of anxiety disorder, bipolar disorder, and posttraumatic stress."

The motion judge, with little explanation, found that Dr. Joss's testimony was not credible and not reliable under the *Daubert-Lanigan* standard,[23] despite the fact that no one had raised that issue at the hearing. In his view, "the examination for competenc[y] or incompetency is a lot more sophisticated with regards to examinations and interviews than has been exhibited by Dr. Joss."

Mary Jo Haggerty testified that she was a licensed social worker with a master's degree in clinical social work. She saw the defendant for counselling briefly in the fall of 1995 and also saw both Adkinsons for three sessions of couple's counselling. The individual counselling was terminated after about a month when Corby called and told Haggerty that "[the defendant] no longer needed to be in therapy."[24] It was Haggerty's impression at the time that "basically [the defendant] was in a situation of being an abused woman. Corby was very controlling, very manipulative, very intimidating. He was a huge guy." Finally, Haggerty testified that in thirty years of practice she had never seen a controlling relationship that reached the level she saw between the defendant and Corby.

Dr. Carol Ball testified that she has a Ph.D in psychology.[25] She had worked with battered women in the past, although her primary expertise was in working with sexual offenders and sexual violence. She evaluated the defendant in 1998 at the

[23]See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-595 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15, 24-26 (1994) (setting forth the factors a judge must consider in determining the reliability of proposed scientific evidence in those cases where the science has not been previously accepted as reliable in the relevant field).

[24]Both Haggerty and the defendant testified that Corby Adkinson repeatedly telephoned the defendant during the therapy sessions, often as many as four or five times in a fifty-minute session.

[25]Dr. Ball's report, which was marked as an exhibit, related that she was an attending psychologist at McLean Hospital and had an appointment as a clinical instructor in psychiatry at Harvard Medical School, supervising doctoral and postdoctoral trainees in psychology.

request of her attorney for the care and protection proceeding on the issue of terminating the defendant's parental rights. The defendant's test results from 1998 showed that, at the time of the testing, "this woman was experiencing a severe mental disorder. The profile suggests a Bipolar Disorder, Generalized Anxiety and Posttraumatic Stress Disorder. . . . [S]he shows an indication of Dependent Personality Disorder and Depressive Personality Traits. . . . The evidence is overwhelmingly in support of the diagnosis of Battered Women's Syndrome accounting for [the defendant's] inability to protect herself and her children. . . . The pattern of violence towards [the defendant] and the children is quite clear in this case, and is substantiated by her children's reports."

The motion judge found that neither Ball nor Haggerty addressed the issue of competency. Although each expert testified to significant issues concerning the defendant's competency, the judge did not consider any of the testimony in ruling on the motion, concluding, instead, that "[n]o reliable or credible expert testimony has been offered to support her claimed incompetency."

At the conclusion of the hearing, the judge denied the motion for a new trial in a written memorandum. He ruled that a competency hearing was not required at the time of trial because competency had never been raised as an issue before or during the trial and because the defendant demonstrated an understanding of the proceedings and an ability to consult with counsel, as evidenced by her jury waiver. The judge also rejected the defendant's substantive claim that she was not competent to stand trial or to be sentenced.

The judge based his ruling that a competency hearing was not required on two grounds. First, he noted that the issue of the defendant's competency was "never . . . raised by anyone" throughout the trial and pretrial proceedings and that there had been no suggestion during the three-week trial that the defendant was incompetent. Second, he reviewed the jury waiver colloquy conducted by the trial judge with the defendant and concluded that the defendant answered all of the questions in an appropriate and responsive manner. The judge reasoned that, because "[t]he standard that applies in deciding whether a defendant is competent to stand trial is the same as that which applies

in determining an effective jury waiver," citing *Ciummei* v. *Commonwealth*, 378 Mass. 504, 514 (1979), the judge's acceptance of her jury waiver demonstrated her competency.

Further, according to the motion judge, the defendant's predominant concern was to regain the custody of her children. The judge found that "[i]t was all or nothing, namely, she had to go to trial and hope that she received not guilty verdicts." He continued, "Just because [her trial strategy was unsuccessful and] she lost with the fact finder does not mean that she was incompetent."

*Discussion.* On appeal, the defendant argues that her rights were violated by reason of a failure to conduct a timely competency hearing before or during the trial.[26] She also argues that the evidence demonstrated that she was incompetent to assist in her defense, because she suffered from battered woman syndrome as the result of abuse inflicted upon her by her husband, the codefendant, and that the motion judge's conclusion to the contrary was wrong.[27]

"It has long been the law of this Commonwealth that the 'trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process' . . . , whether under the Fourteenth Amendment to the Constitution of the United States or under art. 12 of the Declaration of Rights of the Constitution of this Commonwealth." *Commonwealth* v. *Hill*, 375 Mass. 50, 51 52 (1978), quoting from *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971). "The test for competenc[y to stand trial] is

[26]The defendant did not specifically argue in her motion for a new trial that the failure to hold a competency hearing was error, but, as noted above, the motion judge correctly recognized that assessing the defendant's competency in this case raised a question regarding whether a competency hearing should have been held, and the judge addressed that issue in his memorandum of decision, citing the two seminal cases on the issue, *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971), and *Commonwealth* v. *Hill*, 375 Mass. 50, 62 (1978). The defendant appeals from the judge's conclusion that a hearing was not required.

[27]On the motion for a new trial the defendant also argued that the evidence of battered woman syndrome established a defense of duress or coercion that should have been presented at trial. According to the defendant, she engaged her children in sexual acts and participated in giving them cocaine because she was forced to do so by the defendant, of whom she was afraid. She does not present this claim on appeal.

uncontroversial; the accused, before and during the trial, must have 'sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding' and must possess 'a rational as well as factual understanding of the proceedings against [her].' " *Pike* v. *Guarino*, 492 F.3d 61, 75 (1st Cir. 2007), cert. denied sub nom. *Pike* v. *Bissonette*, 552 U.S. 1066 (2007), quoting from *Dusky* v. *United States*, 362 U.S. 402, 402 (1960). Both prongs of this test must be met if a defendant is to be found competent to stand trial. See, e.g., *Dusky* v. *United States*, 362 U.S. at 402; *Commonwealth* v. *Goodreau*, 442 Mass. 341, 350-351 (2004). "In those situations where there exists doubt as to whether the defendant satisfies [the *Dusky*] test [of competence], the judge must, on his own initiative, conduct a full hearing on the issue. *Pate* v. *Robinson*, 383 U.S. 375[, 385 (1966)]." *Commonwealth* v. *Hill*, 375 Mass. at 54, quoting from *Commonwealth* v. *Vailes*, *supra*. "This doubt which necessitates a hearing has been more fully described as 'a substantial question of possible doubt.' " *Commonwealth* v. *Hill*, *supra*, quoting from *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967). Failure to make an inquiry in these circumstances risks convicting an incompetent defendant; thus, omitting such an inquiry where a substantial question of possible doubt exists constitutes a deprivation of the defendant's constitutional right to a fair trial and requires a new trial. See, e.g., *Commonwealth* v. *Robbins*, 431 Mass. 442, 447 (2000); *Commonwealth* v. *A.B.*, 72 Mass. App. Ct. 10, 15 (2008).

We review the judge's decision "to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). In the case before us, the motion judge was not the trial judge. Therefore, "deference is owed only to the motion judge's assessment of the credibility of witnesses [at the hearing on the new trial motion]; [the appellate] court is in 'as good a position as the motion judge to assess the trial record.' " *Commonwealth* v. *Phinney*, 446 Mass. 155, 158 (2006), quoting from *Commonwealth* v. *LeFave*, 430 Mass. 169, 176 (1999). See *Commonwealth* v. *Grace*, *supra*. In addition, "[w]hen a new trial claim is constitutionally based, as in the instant case[], 'this court will exercise its own judgment on the ultimate factual as well as legal conclusions.' " *Commonwealth* v. *Healy*, 438 Mass.

672, 678 (2003), quoting from *Commonwealth* v. *Salvati*, 420 Mass. 499, 500 (1995).

The judge's decision that a competency hearing was not required in this case turns exclusively on the defendant's behavior during trial. While a defendant's demeanor at trial and in response to questioning by the judge "might be relevant to the ultimate decision as to [her competency]," decisional law has made clear that "it cannot be relied upon to dispense with a hearing on that very issue." *Pate* v. *Robinson*, 383 U.S. at 386. See *Commonwealth* v. *Hill*, 375 Mass. at 58 (while "[w]e recognize that the defendant's demeanor at trial and response to questioning by the judge were apparently not unusual . . . [and are] certainly relevant to a decision on the merits of the competency issue, [this] cannot be treated as dispositive of the question whether a hearing should be held on that issue").

Similarly, the judge's reliance on the fact that "competency to stand trial" was not an issue in the record of the trial or pretrial proceedings is misplaced, at least on the facts of this case. "Inquiry into the defendant's claim of incompetenc[y] should not be easily foreclosed on the ground of waiver, since 'it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial.' *Pate* v. *Robinson*, 383 U.S. [at 384]. In his dissenting opinion in the same case, Mr. Justice Harlan said, at 388, that if there were error at the trial level on the question of the defendant's competenc[y] to stand trial, 'such an error is not "waived" by failure to raise it . . . . Waiver is not an apposite concept where we premise a defendant so deranged that he cannot oversee his lawyers.' " *Commonwealth* v. *Hill*, 375 Mass. at 53-54.

Equally significant is the fact that the judge's findings relate solely to that prong of the competency test that the defendant concedes has been established, namely, that she had a rational and factual understanding of the proceedings against her. Our review cannot be so constrained; the other prong of the test requires that we determine whether the defendant could rationally consult with her attorney and assist in her defense.[28]

---

[28]The judge addressed this prong only in the most conclusory way. "This Court believes and finds that at the time of trial, [the defendant] had a 'suf-

In this case, the defendant's claim rests on the "now-unremarkable proposition that battered woman[] syndrome can . . . render a criminal defendant incompetent." *Pike* v. *Guarino*, 492 F.3d at 77.[29] More specifically, the defendant argues that she was unable to consult with her attorney or assist in her defense. See *Commonwealth* v. *Conaghan*, 433 Mass. 105, 109 (2000) ("Evidence of battered woman syndrome is 'material to the issue whether [the defendant] could assist her counsel in preparing a defense that served her best interests.' *McMaugh* v. *State*, 612 A.2d 725, 732 [R.I. 1992]").

The proper inquiry is whether, after a review of the relevant information and evidence available to the judge or to counsel both before and during the trial, there exists a "substantial question of possible doubt" as to whether the defendant was competent to stand trial. *Commonwealth* v. *Robbins*, 431 Mass. 442, 447 (2000). "The inquiry 'is not why counsel failed to request a competency hearing or why the court failed to hold one on its own initiative, but whether, no less on hindsight than by foresight, there were elements of such indication in the situation as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [the defendant's] competency to stand trial.' " *Commonwealth* v. *Companonio*, 445 Mass. 39, 48 (2005), quoting from *Commonwealth* v. *Hill*, 375 Mass. at 54. See *Commonwealth* v. *A.B.*, 72 Mass. App. Ct. at 14-16.

Substantial evidence was adduced in this case that the defendant was incapable of rationally assisting in her defense because of a focused and continuing pattern of abuse against her and domination over her by her husband and codefendant. The motion judge recognized what was obvious and undisputed in the record, that the defendant experienced severe physical and emotional abuse from Corby throughout their lives together. The judge also accepted, at least implicitly, that there was

---

ficient ability to consult with her lawyer with a reasonable degree of rational understanding and a rational as well as a factual understanding of the proceedings.' "

[29]Battered woman syndrome has been defined and discussed extensively in our case law. See, e.g., *Commonwealth* v. *Pike*, 431 Mass. 212, 218-222 (2000); *Commonwealth* v. *Williams*, 453 Mass. 203, 211-213 (2009); *Commonwealth* v. *Fappiano*, 69 Mass. App. Ct. 727, 730-734 (2007).

evidence the defendant suffered from battered woman syndrome.[30] Each of the three experts described the defendant as a victim of battered woman syndrome, and each agreed that Corby exercised a tremendous degree of control over her. The opinions of the experts were corroborated by the defendant's son and by both of the defendant's attorneys, as well as the defendant's own testimony.

In addition, truly startling evidence was presented at the hearing, and apparently credited by the judge, revealing the remarkable amount of control that Corby exercised over the defendant throughout the proceedings. Bielitz, in particular, testified about this in chilling detail.[31] Once Corby isolated the defendant from her attorney, or at least from the opportunity to consult with him privately, he then insisted that the two proceed with a "unified defense" and prohibited any suggestion of a plea or separate trials. This "unified defense," along with regular direct and indirect contact with the defendant, permitted Corby to maintain tight control over the defendant even though they were held in separate facilities.[32] Contrast *Pike* v. *Guarino*, 492 F.3d at 76 (holding, inter alia, that, because the defendant and her boyfriend, the codefendant, had been held for more than a year on separate floors of the facility, their lack of physical proximity had caused his control over her to diminish).

---

[30]In his memorandum of decision addressing the claim of newly discovered evidence, the judge wrote that "[the defendant] and her attorneys *clearly* [emphasis supplied] knew that she could pursue a battered woman[] defense" as was evidenced in her discussions with "Parigian, in what she told the officers of the Lowell [p]olice [d]epartment on the night she was arrested, and in what she told the professional staff at Solomon when she was sent there for mental evaluation." The motion judge also stated that it "was [the defendant] who made the decision not to use the battered woman[] syndrome defense."

[31]Bielitz provided a graphic description of that control, testifying, "She did what she was told. . . . It's like — me having this cup of water and I put it down there; I don't even have to tell it to stay there, it just stays there. It moves when I pick it up. I mean it was — it's indescribable. I have never seen anything like . . . it before. I've never seen anything like it since. And . . . I don't know how it happened."

[32]As noted, the contact included daily letters from Corby to the defendant; regular meetings with the defendant, the codefendant, and their attorneys to prepare for the defense; and daily telephone contact between the defendant and Corby's mother, who further explained what Corby expected from the defendant. See note 11, *supra.*

In rejecting the testimony of the experts and the defendant's argument, the judge's reasoning was, essentially, circular: the defendant was able to make a decision because she made a decision.[33] Although he concluded by saying that there was no credible or reliable evidence that the defendant lacked competency, the judge did not point to a single piece of evidence, apart from Dr. Joss's expertise, that he disbelieved.[34] This case is thus very different from the situation presented by *Commonwealth* v. *Pike*, 431 Mass. 212, 224-225 (2000), where the motion judge explicitly disbelieved the defendant's testimony about her alleged abuse. Here, it appears that the judge credited all of the testimony regarding the history of violent abuse and regarding Corby Adkinson's successful efforts to control the defendant's defense. In the judge's view, however, that evidence did not raise a doubt about the defendant's competency, in part, perhaps, because his definition of competency was too narrow. In any event, we disagree with his conclusion.

We have considered and rejected another aspect of the motion judge's decision. He placed, as does the Commonwealth, significant emphasis on the suggestion that the defendant's goal of reunification with her children was the basis for her pursuit of the ill-advised unified defense, because a finding of not guilty was the only way she would ever regain custody of her children. In so doing the judge observed, accurately, that a defendant has a right to reject a defense suggested by her attorney and that a foolish or unsuccessful choice does not render her incompetent.

We note at the outset that the record support is thin for the

---

[33]The judge explained his reasoning thus: "This Court quite simply cannot and does not accept the testimony and opinions of D[r.] Joss regarding [the defendant's] incompetency (i.e., that she was incompetent because she was unable to make a decision to seek the severance of her and Corby's cases). D[r.] Joss's opinion appears to rest in his belief and evidently in Attorney Bielitz's belief that she must have been incompetent not to have asked for [the] cases [to] be severed. However, [the defendant] decided that they should be tried together . . . ."

[34]Of course, credibility judgments are the province of the motion judge; however, to the extent that the judge here *excluded* Dr. Joss's testimony on his own motion after the hearing, and without argument on the issue from either party or a substantive explanation for his decision, that ruling was an abuse of discretion. See and compare *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300, 326-328 (2010).

finding that reunification with the children was the driving force supporting the defendant's acquiescence in a unified defense; that finding is based almost exclusively on the fact that the defendant retracted her statement, made when she was in Solomon for a psychiatric evaluation, that Corby was abusive, after his lawyer told her on Christmas Day, 1995, that she had better stop telling the staff what was going on at home or she would never get her children back. The defendant also acknowledged on cross-examination at the hearing that she knew she would not get her children back if she was convicted. However, the record also shows that, when Bielitz testified at the motion hearing that it was "foolhardy" to go to trial, the prosecutor unsuccessfully pressed him to concede that the defendant chose trial because a not guilty verdict was the only way she could be reunited with her children and that was her paramount goal. Bielitz responded that he did not know if the defendant understood that strategy and that it was not the viewpoint he had adopted. In addition, the defendant testified at the motion hearing that she had wanted her children to be safe and "if that meant that they were in DSS custody, then that was safe to me."

Even assuming, however, that reunification with her children was an important goal underlying the defendant's decisions, our inquiry remains whether the evidence raises a substantial doubt as to the defendant's ability to consult rationally with her attorney and assist her defense in achieving whatever goal she chose. The issue in a competency inquiry is not whether a defendant has made poor trial choices. See *Commonwealth* v. *Robidoux*, 450 Mass. 144, 156 (2007), quoting from *Commonwealth* v. *Martin*, 425 Mass. 718, 721 (1997) (defendant has a constitutional right to make decisions relating to his defense because "respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and he makes the choice 'with eyes open' "). Rather, the question is whether the defendant, in making those choices, has the ability to consult rationally with counsel and assist in that defense.

We also note that, while a defendant is clearly entitled to pursue an ill-advised defense, the choice of a unified defense in this case does provide at least some additional evidence of the defendant's incompetency. No one associated with this case

believed that the defense was sound. Her own attorney called it "foolhardy," and the motion judge apparently agreed.[35] The defendant's only viable defense at trial was one based on battered woman syndrome, presented in a separate trial. Yet she was prevented from choosing it by her fear of her husband and his ongoing control of her as shown by the evidence. Compare *Commonwealth* v. *Roberio*, 428 Mass. 278, 279-281 (1998), *S.C.*, 440 Mass. 245 (2003) (failure to investigate an insanity defense constitutes ineffective assistance of counsel); *Commonwealth* v. *A.B.*, 72 Mass. App. Ct. at 14 n.6 (defense based on criminal responsibility was only viable option for acquittal and failure to raise it presented troubling concerns about counsel's performance).[36]

On the facts of this case, where evidence of serious, violent, long-term physical and emotional abuse is undisputed; evidence that the defendant suffered from battered woman syndrome is substantial; and evidence of the abuser's ongoing control, to the defendant's detriment, is compelling, there is a substantial question regarding the competency of this defendant to consult rationally with her lawyer in order to assist in her defense, and therefore her competency to stand trial. Central to our analysis is the overwhelming evidence of Corby's ongoing control throughout the proceedings, including in particular the fact that he was able to forestall the defendant's private consultation with her attorney. See *McMaugh* v. *State*, 612 A.2d at 733 (defendant, a severely battered woman, found incompetent to stand trial where her husband and codefendant compelled her to accept his version of events, was present during every meeting with attorneys, and demanded that they be tried together, and defendant passively agreed), cited with approval in *Commonwealth* v. *Conaghan*, 433 Mass. at 111. It makes no difference whether trial counsel should have presented evidence of

---

[35]The motion judge asked: "[H]ow in God's good name could any lawyer ever have predicted a not guilty *in this case* given [the defendant's] statement to police . . . ?" (Emphasis supplied.)

[36]Deciding as we do, we need not examine whether the trial judge was obliged to sever the trials, nor need we address the effectiveness of counsel or whether there was a breach of the duty to represent or the duty of undivided loyalty to the client. We have in mind the fact that this case was tried fifteen years ago at a time when battered woman syndrome was less commonly understood.

incompetency to the trial judge or whether the trial judge should have recognized that the unusual posture in which the case was presented raised concerns about the defendant's competency; the motion for a new trial should have been allowed. Compare *id.* at 110-111. The motion judge's ruling to the contrary was error.

The judgments are vacated, the findings are set aside, and the order denying the motion for a new trial is reversed.

*So ordered.*